**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LEANDROS COOPER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0085 |
| | § | |
| WAL-MART TRANSPORTATION, LLC | § | |
| and WAL-MART STORES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This is an employment discrimination suit. Leandros Cooper, a truck driver who worked for Wal-Mart Transportation, LLC and Wal-Mart Stores, Inc., alleges discrimination and a hostile work environment based on his race. He also alleges that he was terminated from his job in retaliation for filing a Charge of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission. His final claim is that he was assaulted by a Wal-Mart manager.

Wal-Mart has moved for summary judgment. (Docket Entry No. 31). Cooper has responded to the summary judgment motion, (Docket Entry No. 35), Wal-Mart has replied, (Docket Entry No. 36), and Cooper has filed a surreply, (Docket Entry No. 37). Wal-Mart has also moved to strike two of Cooper's potential witnesses, (Docket Entry Nos. 24 and 25); no response has been filed.

Based on a careful review of the complaint; the motions, responses, and replies; the summary judgment record; and the applicable law, this court denies Wal-Mart's motion for summary judgement as to the hostile work environment claim but otherwise grants the motion. Both motions to strike are granted.

The parties are ordered to appear for a status conference on **Thursday, October 15 at 3:30 p.m.** in Courtroom 11-B to set a schedule and trial date.

The reasons for these rulings are explained below.

## I.     The Evidence in the Summary Judgment Record

Leandros Demetrous Cooper is an African-American male born in June 1959.  He is an Army veteran, the father of two adult children, and a truck driver by trade.  (Docket Entry No, 24, Ex. 2 at 9-10).  Cooper began working as an interregional truck driver for Wal-Mart on October 4, 2005.  (Docket Entry No. 31, Ex. 1 at 75, Ex. 5 at ¶ 2).  During the first several months of his employment, Cooper was assigned to Wal-Mart's distribution center in Hurricane, Utah.  (*Id.*).  He later asked for, and received, a transfer to the Sealy, Texas distribution center**,** where he began working on January 27, 2006.  (Docket Entry No. 35, Ex. 3).  In an affidavit, Dana Fuller, Regional Human Resources Manager for Wal-Mart, stated that the transfer was granted "in order to resolve 'issues' that had arisen between [Cooper] and other drivers, including [his] team driver with whom he jointly operated a commercial Wal-Mart truck." (Docket Entry No. 31, Ex. 5, ¶ 3).

Cooper has submitted a declaration stating that while he worked at the Hurricane Distribution Center in Utah, several persons made racially discriminatory comments.  (Docket Entry No. 35, Ex. 5, ¶ 1).  In October 2005, Eric Lasher, the General Terminal Manager, told Cooper "no guns," which Cooper thought was an offensive reference to a stereotype of African-Americans as gun owners.  The next month, Lasher said that Cooper would "run right through this place."  Also in November, a coworker said "monkey's dress like that."  Cooper complained about the coworker's comment to Michael DiGioia, an operations manager.  In December 2005 or January 2006, a "husband and wife team" said "here comes the nigger."  In January 2006, a driver named Don said

"I can't be seen riding around with a burnt co-driver," which Cooper took as a reference to his skin color.  Cooper complained about Don's comment to Julie Winterton, the Human Resources Manager.  Winterton said "that she thought [Cooper] wanted to join the Klan."  Cooper lodged discrimination complaints with two internal entities: Wal-Mart's Resources for Living and Wal-Mart's Ethics Committee.  He also complained to Darwin Jones, the regional personnel manager. Just before Cooper transferred to Sealy, where Paul Peterson is the general terminal manager, Lasher told Cooper that "Paul Peterson is my peezoe."  The record does not reveal what "peezoe" means or what Cooper interpreted it to mean. (Docket Entry No. 35, Ex. 3).

Soon after Cooper began working at Sealy, he accused his team driver – Wal-Mart's drivers work in teams of two in a single truck – of trying to kill him.  The team driver reported that Cooper began yelling profanities at him, encouraging him to cross the median and to "go ahead and kill us both, kill us now."  (*Id.* at ¶ 4).  Some time later, Cooper's truck caught fire.  Cooper told his manager that the team driver had started the fire.  Cooper reported to his manager that he thought his team driver "might have messed with the wiring" because he had asked Cooper to put his sleeping bag and blankets under the truck's bunk, which Cooper believed was for the purpose of causing the fire.  (*Id.*).  Cooper's manager told him that the allegations were outlandish.  Cooper responded that he was "just paranoid."  (*Id.*).

Cooper felt mistreated starting on his first day at Wal-Mart's Sealy Distribution Center.  He alleges that he was forced to sit outside the office of human resources manager Kay Murphy while she and three drivers "went over my personal information on Ms. Murphy's computer."  (*Id.* at ¶ 2). Cooper's dissatisfaction continued:

> Then they made me go through a second orientation.  They also made
> me sit in a third orientation for one day.  When I was trained they

3

overbooked my loads and I did not have time to take lunch breaks. This lasted 7 to 8 days. Management did not train any of the other white drivers (Don, Dennis, Darren, and Mike) who went to orientation with that way.  Two of them (Darren and Dennis) became store ambassadors.  Further, when I first started at Sealy, they made me run local and domicile even though I bid for and was awarded interregional.  White drivers (George Murdock, Calvin Johnson, Michael Chmelik, Dennis Ramsey, Roy Whatley and Dennis Miller) were permitted to run the routes they bid for.

(*Id.*).  According to Cooper, in "September/October of 2006, I complained to Dana Fuller, the Regional Human Resources Manager that white drivers are given more favorable routes, better mileage, and better pay."  (*Id.*).  Cooper's specific complaint about pay, by his own admission, was that "my pay was lower then it was at the Hurricane Distribution Center."  (*Id.* at ¶ 4).  Cooper also asserts that he complained about having to pass six drug screens, which was more than white drivers.  "I specifically complained," he states, "that I was being discriminated against."  (*Id.*).  Fuller remembers differently, testifying in her declaration that "at no time did [Cooper] ever inform me or any other member of management that he believed any alleged conduct directed towards him was on account of his membership in any protected classification."  (Docket Entry No. 31, Ex.5).  For the purposes of this summary judgment motion, Cooper's version must be accepted as true.

Fuller and Murphy investigated Cooper's complaints "seriously and promptly and thoroughly," finding that "[n]one of his complaints could be substantiated."  (*Id.*).  Fuller testified in her deposition that when she looked at Cooper's drug-testing record, it showed that he had only been tested twice, which was "not unusual" and "not a lot."  (Docket Entry No. 31, Ex. 4 at 36-37). She found no signs of deviation from Wal-Mart's randomized testing program.  (*Id.*).  When Fuller investigated Cooper's pay complaint, she found that his Average Day's Pay (ADP) – the metric Wal-Mart uses for measuring pay, because wages vary daily based on miles driven – had actually

increased since he transferred to Sealy.  (*Id.*).  Finally, with respect to route assignments and mileage allocations, Wal-Mart used its blind, computer-operated system in assigning work to Cooper.  Fuller explained how the assignment system works:

> Drivers operating out of the Sealy Distribution Center. . .are given their load assignments by dispatchers located at the Regional Operations Center ("ROC"), which is an off-site facility located in Bentonville, Arkansas.  All trucks have an on-board computer which allows for communication to the ROC. . . . Thus, although all drivers receive the same pay for the same activities, and miles are paid on a graduated scale determined by a driver's length of service, a driver's pay can be affected by the accuracy of the driver's [time entries in the on-board computer], which, in turn impacts how much activity and/or how many miles a driver is assigned during each work week.  Additionally, the only identifying characteristic of truck drivers available to the ROC dispatchers is the driver's identification number, not the driver's race, or any other personal characteristic. . . .

> Additionally, Wal-Mart executes a bid process twice a year, during which changes to driver schedules and depart days/times are made. . . . Through the bid process, drivers rank their route/load choices in order of preference, allowing for individual driver preferences on matters such as the first load of the week, departure day/time and the type of program, *i.e.*, whether they would prefer local driving routes or interregional driving.  Each bid is measured solely by the longevity of the driver's employment at the facility at which they are working.  Therefore the drivers with the longest tenure at each facility will usually get their top choices.

(Docket Entry No. 31, Ex. 5 at ¶¶ 12, 14).  Fuller found no evidence that Wal-Mart had deviated from the system in Cooper's case.  (*Id.*).

Cooper lodged  several other internal complaints while working in Sealy.  In October 2006, he complained to Murphy that someone had torn his paycheck or pay stub.  Murphy explained to Cooper that the checks are prepared in the payroll department in  Bentonville, Arkansas and sent to Sealy in sealed envelopes.  As a result, nobody at the Sealy Distribution Center could have torn

Cooper's paycheck.  Murphy concluded that Cooper's complaint could not be substantiated. (Docket Entry No. 31, Ex. 6 at ¶¶ 4-5).

In November or December 2006, Cooper complained to Paul Peterson, the General Warehouse Manager, that someone had rubbed poison ivy on his uniform.  He made the complaint because his uniform gave him a skin rash.  In his deposition, Cooper testified that he thought more senior drivers may have rubbed poison ivy on his uniform as a form of hazing, "trying to get rid of him." (Docket Entry No. 31, Ex. 1 at 80-82)  Wal-Mart found no evidence to substantiate Cooper's allegation. (Docket Entry No. 31, Ex. 7 at ¶ 5).  Peterson suggested to Cooper that "perhaps a better explanation. . .was an allergy to the cleaning agent used for the uniforms." (*Id.* at ¶ 6).

In December 2006, Cooper complained to Peterson that someone had contaminated his container of baby wipes with poison ivy.  Cooper's accusation was based on a skin rash that he believed was caused by the baby wipes.  Peterson found no evidence to substantiate the claim that someone had deliberately contaminated the wipes with poison ivy.  Peterson offered to reimburse Cooper for the cost of the wipes, but Cooper refused.  (*Id.* at ¶¶ 5-6).

In February 2007, Cooper told Larry Estes, the operations manager, that another driver had urinated in his truck.  Wal-Mart could not investigate the claim because Cooper had already cleaned his truck with a disinfectant by the time he reported it.  (Docket Entry No. 31, Ex. 9, ¶ 21).  Wal-Mart managers were concerned, however, that the accusation "made no sense" because the other driver shared the truck with Cooper. (Docket Entry No. 31, Ex. 6, Attachment C).  That same month, Cooper complained that an unidentified person had "tainted the seatbelts of his truck with foul-smelling cologne." (*Id.*, ¶ 23). Cooper was asked to clean the seatbelts with cleaning wipes.  (*Id.*).

With the apparent exception of the seatbelt incident, Fuller was informed of each of Cooper's complaints.  She found the repeated "bizarre" and unsubstantiated complaints to be "strange conduct" and with each incident became increasingly concerned about Cooper's "irrational conduct and integrity."  (Docket Entry No. 31, Ex. 5, ¶¶ 20, 22).

In addition to these incidents, Cooper also testified in his declaration about discriminatory comments he heard while working at the Sealy Distribution Center.  In February 2006, two drivers asked Marvin Jones, Cooper's "mentor," to ask Cooper for Zig-Zags, which are used for smoking marijuana.  In March 2006, Peterson said "I hope you learned a lesson" and "we are a family here." In June 2006, John, a driver at the Hurricane Distribution Center, called Cooper a monkey in a telephone conversation.  In July or August of 2006, an operations manager named Rob told Cooper he "could not hang in my neighborhood."  Sometime that year, Rob punched Cooper in the arm and stomach and told him that his apartment might be on fire.  In October 2006, a white driver at Wal-Mart's warehouse in Palestine, Texas said the word "nigger" after Cooper arrived.  In December 2006, Charise Lambros "in Safety" told Cooper that he "need[ed] to be careful."  In January 2007, dispatch coordinator Ruth Johnson asked Cooper, "has anybody whipped you yet?"  On April 27, 2007, George Murdock, another driver, told the doctor performing a physical on Cooper to "bury him deep."  (Docket Entry No. 35, Ex. 3, ¶ 3).

In February 2007, Cooper complained to Estes, Murphy, and Peterson about Mike Hansen, Wal-Mart's regional transportation manager.  (Docket Entry No. 35, Ex. 3, ¶ 5).  Cooper alleged that Hansen had "assaulted" him on three separate occasions.  The first took place sometime near the end of 2006, when, according to Cooper's affidavit, Hansen "deliberately walked up to me and smacked me on the shoulder spilling hot coffee all over my wrist and hand."  Cooper described Hansen as having a "sinister look on his face."  (*Id.*).  Hansen, who supervises 1,200 employees at 10 locations,

7

did not remember "meeting, speaking with, or even seeing Mr. Cooper" on that occasion.  (Docket

Entry No 31, Ex. 8, ¶ 2).  When Hansen visits Wal-Mart distribution centers, he often "meet[s]

several drivers and engages in friendly conversation with them," which includes shaking the drivers'

hands and patting them on the shoulder or back.  Hansen surmised that is what he was doing on the

first occasion Cooper claims he was assaulted, and that "if I did make any contact with him that

caused him to spill his coffee, it would have been an accidental bump."  (*Id.*).

The second and third alleged assaults both took place on January 31, 2007 at the Sealy

Distribution Center.  Cooper testified that early that morning, as he was driving in the parking lot,

Hansen "pulled [him] over," questioned him, and "smacked [him] on the shoulder twice."  (Docket

*Id.*, Ex. 3).  Because he was wearing a jacket, Cooper did not feel any pain.  In his deposition,

Cooper described the contact as "[j]ust – you know how you hit somebody on the back of the

shoulder."  (*Id.*, Ex. 1 at 103).  Hansen testified that, early that morning, he saw Cooper drive his

car through the parking lot at an unsafe speed.  Hansen pulled up behind where Cooper had parked,

got out of his car, and had a "friendly conversation" with Cooper about driving safely in the parking

lot.  During the conversation, Hansen "patted [Cooper] on the shoulder in what [Hansen] believed

was a friendly and courteous manner."  (Docket Entry No 31, Ex. 8, ¶ 3).  Cooper did not say

anything to Hansen indicating that he did not appreciate the physical contact. (*Id.*, Ex. 1 at 104).

Later that same afternoon, Hansen spoke to a group of drivers, including Cooper, at a meeting about

defensive driving.  When Hansen finished speaking, Wal-Mart surprised him with a small party to

celebrate his 20-year anniversary with the company.  Hansen and the other drivers chatted and ate

the cake that had been provided.  Hansen does not recall any specific interaction with Cooper but

does remember seeing him there and in apparently good spirits.  (*Id.*, Ex. 8, ¶ 4).  According to

Cooper, however, Hansen "deliberately ran over four or five drivers" to reach Cooper to "smack" him on the shoulder.  "The hit was painful and stung." (Docket Entry No. 35, Ex. 3, ¶ 5).

Cooper called Murphy and Estes on February 15, 2007 to tell them that he was in need of medical treatment because he had been injured by someone at work.  Cooper was told to come to the Distribution Center so that he could be sent for medical treatment.  Cooper informed Murphy and Estes that he had already sought treatment at the VA Hospital on February 13, receiving antibiotics or a tetanus shot for a puncture wound on his shoulder.  Cooper testified that he went to the hospital that day because, after not feeling well for two weeks following the defensive driving meeting, he noticed in the mirror a purple or black mark on his shoulder.  At that point, "everything just registered."  He concluded that Hansen "actually did stick [him] with something."  (Docket Entry No. 31,  Ex. 1, Cooper Depo., at 112-13).  Cooper concluded that Hansen must have had a hidden object in his hand that he used to puncture Cooper's skin while patting his shoulder during the surprise party.  (*Id.* at 111-13).  On the morning of February 15, 2007, however, when Cooper first spoke to Murphy and Estes, he told them he was feeling "okay" and that he would come into the distribution center once he had completed his current delivery.  (Docket Entry No. 31, Ex. 6, ¶ 8).  Before Cooper came in, Lieutenant Faircloth of the Sealy Police Department came to the Sealy Distribution Center and told Murphy that Cooper had called the Police Department to file assault charges against Hansen.  Faircloth reported that Cooper had told the police that "Hansen probably had a 'needle under his ring' and had injected him with the needle."  (*Id.*, ¶ 9).

Later that day, Cooper came into the distribution center for a meeting with Peterson, Murphy, and Estes.  He told them what he thought Hansen had done.  He also told them he did not feel well; that his "equilibrium was off"; and that he did not feel that it was safe for him to drive.  (Docket Entry No. 31, Ex. 1 at 114-115).  Cooper completed an internal Wal-Mart form laying out the basics

9

of his injury.  He reported suffering a "possible puncture wound," resulting in "bruises" on the "top right shoulder" after a "slap on [the] back by Mike Hanson (sic)."  (Docket Entry No. 31, Ex. 5). Murphy recommended that Cooper seek immediate medical treatment, which he did that same day at Memorial Hermann Hospital.

Murphy completed an injury report and conducted an investigation into this third alleged assault.  As part of the investigation, she interviewed several of the other drivers who had been present at the defensive driving meeting.  Murphy was unable to substantiate Cooper's claim.  (*Id.*, Ex. 6, ¶ 27).

Murphy informed Fuller of all these developments.  Wal-Mart's worker's compensation representative took a statement from Cooper, in which Cooper said that his head, neck, and shoulder were injured, his vision was blurred, and "his brain was all out of whack."  (*Id.*, Ex. 5, ¶ 25).  Based on this information, Fuller decided to remove Cooper from active duty effective February 15, 2007, placing him on paid medical leave.  She did so "out of concern for [Cooper's] mental and physical health, and out of concern for the motoring public."  (*Id.*, ¶ 26).  Fuller required Cooper to obtain a fitness for duty examination before returning to work.  (*Id.*).

Murphy conducted a more detailed investigation, in which she interviewed approximately 20 Wal-Mart employees present at the January 31, 2007 meeting, "all of whom denied witnessing Mr. Hansen interact in any unusual manner with [Cooper]."  The investigation again revealed no evidence to substantiate Cooper's claims.  (*Id.*, ¶ 27) .  On February 19, 2007, Cooper submitted a sworn statement to the police, complaining of a puncture wound inflicted by Hansen.  (Docket Entry No. 35, Ex. 1 at 115-17).  Sometime in February, the Sealy Police Department contacted Hansen, requesting a statement about the January 31 meeting.  He complied.  On March 14, 2007, the District

Attorney's office notified Hansen and Cooper that no charges would be filed because there was insufficient evidence of criminal wrongdoing.  (Docket Entry No. 31, Ex. 5, ¶ 28).

Wal-Mart asked Cooper to see Dr. Mark Bing for a physical to determine if he was fit for duty.  Wal-Mart has submitted evidence that Dr. Bing was "the doctor who provided Department of Transportation fitness for duty examinations for all truck drivers operating out of the Sealy Distribution Center."  (*Id.*, Ex. 5, ¶ 29).  On his first visit, around February 23, 2007, Cooper saw a nurse practitioner, who examined him.  Cooper told the nurse practitioner that the injury on his shoulder was from a bug bite and left the office before Dr. Bing could see him.  (Docket Entry No. 31, Ex. 7 at 3).  Wal-Mart instructed Cooper to return to see Dr. Bing.  The doctor examined Cooper, conducted an MRI, and ordered a series of tests.  Dr. Bing disqualified Cooper from work for 60 days.  He communicated his findings to Wal-Mart in a March 14, 2007 letter, noting a particular concern about unexplained dizziness.  (*Id.*, Ex. 6, Attachment B).  Dr. Bing also contacted Murphy and suggested that Cooper be given a psychological evaluation.  (*Id.*, Ex. 5, ¶ 33).  On March 21, Fuller notified Cooper that Wal-Mart was concerned about his mental health and safety, and the safety of others.  Fuller told Cooper that, in addition to the 60-day medical disqualification from work, he needed to submit to a psychological fitness-for-duty exam in order to return to work.  (*Id.*, ¶ 34).

Cooper made an appointment with a psychologist, Dr. Lisa Weaver.  Murphy asked Dr. Bing to consult with Dr. Weaver before the examination to discuss Cooper's case.  Murphy provided Dr. Bing a written summary of the problems she and other members of the "management team" at the Wal-Mart Transportation Office had observed that caused "serious concerns about his mental health."  (*Id.*, Ex. 6, Attachment C).  The summary listed some basic personal information, the complaints and allegations Cooper had made during his employment, and the events that had

transpired since the third alleged assault.  (*Id.*, Ex. 6, Attachment C).  Dr. Bing contacted Murphy on April 2, 2007, telling her that only a psychiatrist could conduct the type of examination that Cooper required.  When Cooper arrived at Dr. Weaver's office for his April 9 appointment, Dr. Weaver, a psychologist, realized the same thing and did not examine Cooper.  (*Id.*, Ex. 6, Attachment D).  Murphy attempted unsuccessfully to schedule Cooper for appointments with two psychiatrists.  In the meantime, Cooper continued to see Dr. Bing, who certified him to return to work on April 27, 2007.  Despite that certification, Fuller did not want Cooper to return to work because he had not yet been evaluated by a mental health professional. (*Id.*, Ex. 5, ¶ 35).  Fuller sent Cooper a letter on May 3, directing him to see a psychiatrist.  On May 9, Cooper sent Wal-Mart progress notes from a May 4 visit with Dr. Aruna Gottumukkala, a psychiatrist at the VA Hospital. The notes did not address whether Cooper was fit for duty.  Fuller followed up with Dr. Gottumukkala in a letter asking her opinion as to Cooper's "fitness for duty as a commercial truck driver."  The doctor did not respond.  Murphy sent a second letter, which also drew no response. Fuller explained to Cooper that he still had not provided sufficient documentation to return to active duty.  (*Id.*, Ex. 5, ¶¶ 37-40).

Just a few days before that, on May 1, 2007, Cooper had filed a Charge of Discrimination with the Texas Workforce Commission (TWC) Civil Rights Division and the United States Equal Employment Opportunity Commission (EEOC).  In the part of form asking what the alleged discrimination was "based on," Cooper checked the boxes for "race" and "retaliation."  He stated that the discrimination began on October 4, 2005 and was ongoing.  The Charge of Discrimination stated as follows:

> I. On October 4, 2005, I was hired as a driver for Wal-Mart.  Since the date of my hire, I have noticed difference in treatment in how I am treated compared to the White Drivers that started around the

same time as me.  White drivers are given more favorable routes, more milage, and better pay.  Around September or October 2006, I complained of the difference in treatment I received in Sealy, TX to Dana Fuller, Regional Personnel Manager.  She told me that she would get back in touch with me but never did.  On January 31, 2007, I was assaulted by my Regional Manager, Michael Hansen, because I complained of the difference in treatment.

II. No reason was given to me concerning the above stated difference in treatment.

III. I believe I have been discriminated against because of my race, Black, and retaliated against for opposing an unlawful act, in violation of Title VII Civil Rights Act of 1964, as amended.

(Docket Entry No. 35, Ex. 10).

Cooper also attached handwritten notes that outlined what he viewed as incidents of discrimination. In addition to the events recounted in his declaration, there are some others.  For example, Cooper wrote that he saw a particular type of cross at a dispatcher's desk, which the dispatcher told Cooper was for her church; Cooper asserted that it was racist because he saw the same type of cross on a Klu Klux Klan website.  (*Id.*, Ex.12 at 5).   He reported that Wal-Mart spied on him and that "security or department personnel" followed him in Wal-Mart stores.  (*Id.* at 6-7). Cooper also described a "cover up" of Hansen's assault involving Dr. Bing, in which the doctor told Cooper that he "couldn't find anything wrong with [him]" and failed to provide proper care.  (*Id.* at 3).

The EEOC investigated under its work-sharing agreement with the TWC.  On September 10, 2007, the EEOC issued a Dismissal and Notice of Rights, informing Cooper that it is "unable to conclude that the information obtained establishes violations of the statutes." (Docket Entry No. 31, Ex. 13).  The TWC adopted the EEOC's findings and sent Cooper a right-to-sue letter on September 26, 2007.  (*Id.*, Ex. 14).

From April 2007 to September 2007, Cooper was on medical leave of absence.  He did not contact Wal-Mart.  On September 7, Murphy had received a call from "Rae" at the office of a psychiatrist, Dr. Rakesh Desai.  Rae told Murphy that Cooper had come in to request a fitness-for-duty exam.  Cooper had told Rae that Wal-Mart would pay for the exam.  According to Fuller, "[n]obody at Wal-Mart ever authorized [Cooper] to make such a representation."  (*Id.*, Ex. 5).  Murphy never told Cooper that Wal-Mart would pay for that examination.  (*Id.*, Ex. 6).

On September 19, Cooper obtained a fitness-for-duty letter from Dr. Desai.  Cooper paid for Dr. Desai's examination himself.  He instructed Dr. Desai's office to fax the letter to Wal-Mart's attorney, Linda Noel Fleunmond.  Cooper spoke to Fleunmond that same day; she told him she had received the fax.  (Docket Entry No. 35, Ex. 3).

On September 18, 2007, Fuller and Ed Parrish, the Director of Human Resources for Transportation, decided to terminate Cooper's employment.  Fuller explained her reasoning as follows:

> [T]hroughout [Cooper's] employment at the Sealy Distribution Center, I had grown concerned regarding [Cooper's] mental health and fitness to function as a commercial truck driver. My concerns were first based on [Cooper's] outlandish complaints that could not be substantiated, which also caused me to question [Cooper's] integrity. When [Cooper] ultimately complained that a Regional Transportation Manager had "assaulted him" by puncturing his shoulder with ring containing a needle full of poison, I felt that it was absolutely necessary for [Cooper] to be certified as fit for duty before operating a Wal-Mart truck again. When Dr. Bing confirmed my concern by disqualifying [Cooper] from work and expressing his own concern for [Cooper's] well being, I determined that [Cooper] could not be returned to work as a commercial truck driver until a qualified mental health professional examined [Cooper] and a physician with appropriate experience certifying truck drivers as fit for duty under the Department of Transportation Regulations determined that [Cooper] was fit to perform such duties.

14

By September 18, 2007, I felt that, although [Cooper] had been provided repeated opportunities to seek the required fitness for duty examination, he was intentionally avoiding doing so.  Indeed, in making my decision to terminate [Cooper's] employment, among other things, I noted that: (1) although Dr. Bing offered to arrange a meeting for [Cooper] with a psychiatrist, [Cooper] declined Dr. Bing's assistance because he "didn't want to go" and (2) [Cooper] intentionally failed to disclose all of the relevant facts to Dr. Gottumukkala and otherwise failed to obtain her professional opinion regarding his fitness for duty.  Additionally, I felt that, through his employment with the Sealy Distribution Center, [Cooper] repeatedly made inaccurate statements regarding his co-Associates and members of Wal-Mart management that were essentially lies.

(*Id.*, Ex. 5, ¶¶ 44, 45).

On September 20, 2007, Peterson and Murphy conducted Cooper's exit interview.  Otis Laskey was also present.  Fuller spoke to Peterson and Murphy before the meeting to discuss what Peterson should say to Cooper.  Peterson told Cooper that Wal-Mart had investigated all his complaints in good faith, as had the Sealy Police and the EEOC.  Peterson said that Wal-Mart had seen a "pattern of integrity issues" and noted specifically Cooper's accusations against coworkers and Hansen and the representation made to Dr. Desai that Wal-Mart would pay for the examination.  Peterson told Cooper that Wal-Mart does not allow, accept, or tolerate integrity issues," and that Cooper's employment was terminated.  (Docket Entry No. 35, Exs. 14, 15).  Cooper refused to sign the exit interview form because it said "Continued integrity issues, gross misconduct, and non-rehirable," which he thought might implicate him in "fraudulent activity." (*Id.*).

Cooper sued Wal-Mart in Texas state court on November 16, 2007, alleging employment discrimination and retaliation under Texas statutory law, *See* TEX. LAB. CODE §§ 21.051, 21.055, as well as a common-law assault claim.  Wal-Mart removed to this court on January 7, 2008 on the basis of diversity jurisdiction.  (Docket Entry No. 1).  The parties engaged in extensive discovery, which included several oral depositions.

15

As of October 31, 2008, when he was deposed, Cooper was employed by Crete Carrier Corp. as a truck driver.  He testified in his deposition that during his orientation with Crete in 2008, an "elderly gentleman" assaulted him at a restaurant for which Crete had given Cooper and the other drivers a $10 gift card.  Cooper testified that he was walking out of the restaurant with a sandwich in one hand and a beverage in the other, and this elderly gentleman and his wife were walking in.  The man started laughing and engaging in a "nonchalant conversation" with Cooper, in which he referred to Cooper's meal and asked, "[w]ell, is that for me?"  At the same time, according to Cooper, the man "grabbed" Cooper on his shoulder and with his other hand "smack[ed]" Cooper on the back of his tricep.  "[D]ays later, a welt showed up" in the same location.  Cooper photographed the welt with his camera phone.  (Docket Entry No. 31, Ex. 1, Cooper Depo. at 34-37).  In his deposition, Cooper speculated that there was some association between this restaurant incident and the alleged assault by Hansen.  Cooper alleges that, because Wal-Mart has some business dealings with Crete and Crete knew Cooper would be at the restaurant, the event was "an outright racist-terrorist assault on me, against me" by Wal-Mart and Crete. (*Id.* at 38-41).  Cooper also believed that he was being followed in his truck and spied on by individuals sent by Wal-Mart security and the Klu Klux Klan because "it would benefit Wal-Mart to just have [him] incarcerated."  (*Id.* at 48-50).

Wal-Mart has moved for summary judgment on all Cooper's claims.  Cooper has responded, Wal-Mart has replied, and Cooper has file a surreply.  Wal-Mart has also moved to strike two of Cooper's potential witnesses.  Each of these motions is examined below.

## II.    Wal-Mart's Motions to Strike

Wal-Mart has moved to preclude Cooper from calling two witnesses at trial: Dr. Aruna Gottumukkala and Dr. Paul Rousseau.  (Docket Entry Nos. 24, 25).  Cooper designated Rousseau

as an expert witness.  During discovery, Wal-Mart learned that Gottumukkala could be a potential witness as well.

Both these doctors are employed by the Department of Veterans Affairs at the VA Hospital in Houston.  Under Federal Regulations, VA personnel may not give "opinion or expert testimony in any legal proceedings concerning official VA information, subjects or activities, except on behalf of the United States or a party represented by the United States Department of Justice."  38 C.F.R. § 14.808.  VA personnel may give factual testimony, but only on written request from the party seeking the testimony and with the approval of "the General Counsel, the Regional Counsel, an attorney in the Office of General Counsel designated by the General Counsel, or an attorney in the Regional Counsel office designated by the Regional Counsel."  38 C.F.R. §§ 14.805, 14.807(b).

Wal-Mart submitted written requests to depose Gottumukkala and Rousseau.  The VA denied both requests.  Wal-Mart argues instead that because it could not take the doctors' depositions, it would suffer "unfair prejudice" if Cooper were able to use them as witnesses at trial.  (Docket Entry Nos. 24 at 1, 25 at 1).  Cooper has not responded to the motions to strike.

Wal-Mart is in a position analogous to a party whose opponent is attempting to designate an expert after the deadline for doing so has passed.  In those cases, a district court must "consider four factors in determining whether the testimony of a late-designated expert witness should be permitted: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness."  *Campbell*, 138 F.3d at 1000 (5th Cir.1998) (citation omitted); *see also Metro Ford Truck Sales, Inc. v. FordMotor Co.*, 145 F.3d 320, 324 (5th Cir.1998) (citation omitted).

The fourth factor does not apply here because there has been no lapse by Cooper for which he must provide an explanation. As to the first factor, the Fifth Circuit has taken two divergent approaches. *See Soliz v. Assocs. in Med., P.A.*, No. 4-06-2785, 2007 WL 2141392, at *2 (S.D.Tex. July 25, 2007). Under one approach, the more important the witness, the more important the need for prompt designation. *Id.* (citing *Geiserman v. MacDonald*, 893 F.2d 787, 791-92 (5th Cir.1990)). More recently, however, the Fifth Circuit has recognized that parties should be given more latitude when a witness is more important to them. *See id.* (citing *Betzel v. State Farm Lloyd's*, 480 F.3d 704, 707-08 (5th Cir.2007)).

There is scant evidence in the record about the importance of these witnesses. The analysis must rest on the second and third factors, and both favor striking the doctors as witnesses. Wal-Mart would be prejudiced if the witnesses were permitted to testify with no opportunity to depose them. A continuance would not address this problem if, as the record indicates, the VA continued to prevent the doctors from being deposed. Wal-Mart's motions to strike Gottumukkala and Rousseau as witnesses are granted.

## III.    Wal-Mart's Motion for Summary Judgment

### A.    The Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by " 'showing'-that is, pointing out to

the district court-that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F .3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.* , 780 F.2d 1190, 1194 (5th Cir. 1986).  "Thus, if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor."

*Id.*; *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265 Fed. App'x 155, 157

(5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*).

Cooper brought his retaliation claim under § 21.055 of the Texas Commission on Human

Rights Act ("TCHRA") and his discrimination and hostile work environment claims under § 21.051

of the same statute.  *See* TEX. LAB.CODE §§ 21.051, 21.055.  The purpose of the TCHRA is to

execute the policies of Title VII of the Civil Rights Act of 1964.  TEX. LAB.CODE § 21.001(1);

*Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).  In applying the Texas statute,

courts should rely on "analogous federal statutes and the cases interpreting them [as a] guide."

*Quantum*, 47 S.W.3d at 476.

### B.    Exhaustion of Administrative Remedies

Wal-Mart argues that Cooper's hostile work environment and retaliatory termination claims

are not properly before this court because Cooper did not exhaust his administrative remedies by

including those claims in his EEOC charge.  "The filing of an administrative complaint is a

prerequisite to a Title VII suit."[1]  *Thomas v. Atmos Energy Corp.*, 223 Fed. Appx. 369, 376 (5th Cir.

2007); *Harris v. Honda*, 213 Fed. Appx. 258, 261 (5th Cir. 2006); *Pacheco v. Mineta*, 448 F.3d 783,

788 (5th Cir. 2006); *Ridgway's, Inc. v. Payne*, 853 S.W.2d 659, 663 (Tex.App.-Houston [14th Dist.],

1993, no writ.) ("Failure to exhaust administrative remedies set forth in the [TCHRA] constitutes

a jurisdictional bar to bringing suit under the Act.").  "A Title VII cause of action may be based, not

only upon the specific complaints made by the employee's initial EEOC charge, but also upon any

kind of discrimination like or related to the charge's allegations, limited only by the scope of the

EEOC investigation that could reasonably be expected to grow out of the initial charges of

---

[1]  Fifth Circuit panels have disagreed over whether exhaustion is a jurisdictional requirement or simply a
prerequisite to suit under Title VII.  *Pacheco v. Mineta*, 448 F.3d 783, 788 n. 7 (5th Cir. 2006).

discrimination." *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1992); *Pacheco*, 448 F.3d at 789 (quoting *Fine* with approval). An EEOC charge must be filed within 300 days of the alleged discrimination. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

In determining whether an allegation in a complaint falls within the scope of an EEOC complaint, a court must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789. This rule is designed to balance two competing policies. *Id.* at 788. On the one hand, the exhaustion requirement "serves the dual purposes of giving the employer some warning as to the conduct about which the employee is complaining and affording the EEOC and the employer an opportunity to settle the dispute through conciliation." *Benson v. Mary Kay Inc.*, No. 3-06-1911 2007 WL 1719927, at *1 n. 1 (N.D. Tex. June 11, 2007). On the other hand, "the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated *pro se*, the scope of an EEOC complaint should be construed liberally." *Pacheco*, 448 F.3d at 788 (quoting *Sanchez*, 448 F.3d at 463) (quotations omitted). "[F]or the most part, the desired liberality is achieved by application of the rule that courts will look beyond the scope of the charge's language to the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge." *Pacheco*, 448 F.3d at 789 n. 9.

### 1. The Hostile Work Environment Claim

Wal-Mart argues that Cooper's hostile work environment claim is outside the scope of the administrative investigation that could reasonably have been expected to result from his EEOC Charge of Discrimination. As Wal-Mart points out, nothing on the face of the Charge states a hostile work environment claim. The factual statement on the Charge form, which is "the crucial element

of a charge of discrimination," *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 879 (5th Cir. 2003), focuses on disparate treatment and does not mention a hostile work environment.  But the seven pages of handwritten notes Cooper attached to the Charge, which include a variety of racially-themed statements attributed to Wal-Mart personnel, indicate that a hostile work environment claim is in play.  (Docket Entry No. 35, Ex. 10, 12).  A reasonable investigator presented with such a long series of incidents would include a hostile work environment within the investigation's scope.

In determining the scope of a reasonable investigation, this court is not limited to the four corners of Cooper's Charge of Discrimination but may also consider the notes he attached.  In *Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280-81 (5th Cir.1994), the Fifth Circuit relied, in part, on the plaintiff's EEOC affidavit and discharge questionnaire in determining that the plaintiff's gender-based disparate treatment claim was like or related to her sexual harassment and retaliation claims. In an unpublished case, the court cited *Clark*, explaining it in a parenthetical: "questionnaire considered in determining whether the plaintiff had exhausted administrative remedies because during the investigation the EEOC pursued all of the alleged claims."  *Harris v. Honda*, 213 Fed. App'x 258, 262 (5th Cir. 2006).  A district court in the Fifth Circuit has addressed the issue and concluded that to determine whether a claim has been exhausted:

> the decision is to be based on the four corners of the EEOC charge, but the court may also consult related documents, such as a plaintiff's affidavit, the response to the EEOC questionnaire, and attachments to the response, when (1) the facts set out in the document are a reasonable consequence of a claim set forth in the EEOC charge, and (2) the employer had actual knowledge of the contents of the document during the course of the EEOC investigation.  This test is subject, of course, to the established principles that the plaintiff's lawsuit may encompass any kind of discrimination like or related to the allegations contained in the EEOC charge, and that the court must not strictly construe the charge and require the complainant to allege every instance of discrimination.

*Hayes v. MBNA Technology, Inc.*, No. 3-03-1766, 2004 WL 1283965, at *6 (N.D. Tex. 2004).

It is unclear from the record whether the EEOC investigated Cooper's hostile work environment claim or whether Wal-Mart had actual knowledge of the notes' contents.  Courts have required knowledge by employers to ensure that the administrative-filing prerequisite is serving its purpose of providing employers with notice of claims and an opportunity to resolve them internally.  *See Hayes*, 2004 WL 1283965, at *5-*6, *5 n.9 (citations omitted).  But even if Wal-Mart did not have access to Cooper's notes, the record shows that he had complained to Wal-Mart about several of the incidents he described in those notes.  For example, Cooper complained about the fire in his truck, the rash caused by his uniform, and someone contaminating his baby wipes, all allegations appearing in his notes.  Wal-Mart argues that Cooper had not once told anyone at Wal-Mart that he suspected any race-based motivation for the issues he complained about.  But the EEOC Charge, which Wal-Mart clearly received, asserts race as its basis.  Because Wal-Mart was aware of many of the alleged incidents underlying Cooper's Charge of Discrimination and described in the notes he attached to that Charge, the notes are appropriately considered in deciding whether the hostile work environment claim would reasonably fall within the scope of the EEOC's investigation.

Reading Cooper's Charge of Discrimination and his notes together makes it apparent that his hostile work environment claim is like or related to the discrimination claim presented to the EEOC.  Cooper's notes allege many instances of harassment, including a series of racial or quasi-racial comments.  A reasonable EEOC official would include the alleged hostile work environment within the scope of the investigation.  Cooper's hostile work environment claim is properly before the court.

2.      *Retaliation*

The Fifth Circuit has created an exception to the exhaustion requirement for claims asserting retaliation for filing an EEOC complaint. *Gupta v. East Texas State Univ.*, 654 F.2d 411, 413-14 (5th Cir. 1981).  In *Gupta*, the plaintiff filed an EEOC charge alleging discrimination in pay and work assignments.  During the EEOC investigation, Gupta filed a second EEOC charge claiming that he had been retaliated against for filing the first charge.  After the EEOC issued a right to sue letter on the first charge, Gupta sued.  The EEOC later issued a right to sue letter on the second charge.  After he filed suit, Gupta was told that his contract would not be renewed.  He did not file a third EEOC charge based on the nonrenewal but added an allegation to his lawsuit that the nonrenewal was in retaliation for filing the first two EEOC charges.  *Id.* at 412-13.  The court held that the exhaustion requirement did not bar the retaliation claims.  Additional EEOC filings based on events after a lawsuit was filed  "would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII . . . especially since the EEOC relies largely upon the private lawsuit to obtain the goals of Title VII."  *Id.* at 414.  The panel decided that Gupta's "retaliatory discharge" (nonrenewal) claim was within the district court's jurisdiction.  "[I]t is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court."  *Id.* at 413.

Wal-Mart admits that *Gupta* "might allow" Cooper to proceed on his retaliatory termination claim without filing a second EEOC charge, but argues that *Gupta* "has been undermined or abrogated by the Supreme Court's holding in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)."  (Docket Entry No. 36 at 8 n.5).  In *Morgan*, the Supreme Court held that Title VII plaintiffs could not use a "continuing violation" theory to assert claims that were barred because

they were based on employer acts outside the 300-day statutory window for filing an EEOC charge. *Morgan*, 536 U.S. at 113-14. After *Morgan*, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114. Although *Morgan* involved incidents that took place before the EEOC charge was filed, courts have extended it to exclude any acts that occurred after filing from piggybacking onto an earlier-filed charge. *See, e.g., Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003); *McKenzie v. St. Tammany Parish School Bd.*, No. 04-0420, 2006 WL 2054391, at *2, 3 (E.D. La. Jul. 19, 2006); *Prince v. Rice*, 453 F.Supp.2d 14, 23-24 (D.D.C. 2006); *Romero-Ostolaza v. Ridge*, 370 F.Supp.2d 139, 148-50 (D.D.C. 2005). Some courts have gone a step further, holding that administrative remedies must be separately exhausted for claims of retaliation based on an earlier-filed EEOC charge that is already properly before the court. *See Prince*, 453 F.Supp.2d at 23-24; *Romero-Ostolaza*, 370 F.Supp.2d 148-50.

Courts in the Fifth Circuit have continued to apply *Gupta* after *Morgan*. *See Lightfoot v. OBIM Fresh Cut Fruit Co.*, No. 4-07-608, 2008 WL 449512, at *3 (N.D. Tex. Oct.2, 2008) (applying *Gupta* but distinguishing it on the facts); *Ocampo v. Laboratory Corp. of America*, No. 04-538, 2005 WL 2708790, at *7 (W.D. Tex. Sept. 6, 2005) ("Assuming the claims based on the charge of age discrimination are properly before the Court, and given [*Gupta*], Ocampo was not required to file a second charge of discrimination."); *Green v. Louisiana Casino Cruises, Inc.*, 319 F.Supp.2d 707, 710-11 (M.D. La. 2004) (citing *Gupta* and two later Fifth Circuit cases for the proposition that "a plaintiff is not required to exhaust administrative remedies before seeking review of a retaliation claim that grows out of an earlier EEOC charge); *see also Houston v. Army Fleet Services, LLC*, 509 F.Supp.2d 1033 (M.D. Ala. 2007) (citing *Gupta*, which is binding in the Eleventh Circuit as well); *White v. Potter*, No.1-06-1759, 2007 WL 1330378, at *7 (N.D. Ga. Apr.

30, 2007) (finding *Gupta's* policy rationale persuasive, recognizing the D.C. District Court's post-*Morgan* opinions as rejecting *Gupta's* holding, but deciding not to follow the D.C. decisions "given that *Gupta* is binding precedent in [the Eleventh] Circuit").

Under *Gupta*, Cooper's retaliatory termination claim is "properly before the court" because it grows out of the earlier filed EEOC and TWC charge. *See Gupta*, 654 F.2d at 413. On these facts, *Gupta* places the retaliation claim within this court's "ancillary jurisdiction." *Id.* Because Cooper's retaliation claim falls within an exception to the exhaustion requirement, this court will consider it on the merits as well.[2]

### C.    The Retaliation Claim

On the merits, Cooper's retaliation claim fails as a matter of law. The *McDonnell Douglas* burden-shifting framework applies to retaliation claims. *See Mota v. Univ. of Texas Houston Health Science Center*, 261 F.3d 512, 519-20 (5th Cir. 2001); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. The burden then shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Mota*, 261 F.3d at 519-20. The standard of proof on the pretext

---

[2]  The parties disagree about whether the retaliation claim could reasonably be expected to grow out of the EEOC investigation based on Cooper's charge. Because Cooper was terminated *after* the EEOC issued a right to sue letter, his job termination could not have been within the scope of the EEOC investigation. *See Felder v. City of Baytown*, 229 F.3d 1147 (5th Cir. 2000) (unpublished) (per curiam). Cooper responds that the TWC did not adopt the EEOC's findings and issue its own right to sue letter until six days after Cooper was fired. The TWC did not, however, perform an independent investigation. It relied on the EEOCs work, which was completed before Cooper's job termination. But because *Gupta* carves out an exception to the ordinary scope-of-investigation test, the argument is moot.

element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d 601 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

The elements of a *prima facie* retaliation claim are that: (1) the plaintiff engaged in an activity protected by the statute; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).  Title VII's antiretaliation provision encompasses two broad types of protected activity, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The Texas statute is similar:

> An employer commits an unlawful employment practice if the employer retaliates against a person who (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

TEX. LAB. CODE § 21.055.  Under the statute, making internal complaints or filing a charge with the EEOC or the TWC is protected  conduct.[3]

The Supreme Court recently clarified in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), that an "adverse employment action" is defined differently in the retaliation context than it is in the discrimination context.  *Id.* at 68, 126 S.Ct. 2405.  In the retaliation context, it is an action that "a reasonable employee would have found

---

[3]  In his summary judgment briefing, Cooper identifies only filing the charge as protected activity.  (Docket Entry Nos. 35 at 20, 37 at 9-10).

. . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted).

In his opposition to Wal-Mart's summary judgment motion, Cooper identifies only his termination as a possible adverse employment action.[4]  Job termination is clearly an adverse employment action.

The causal link required for a *prima facie* showing of retaliation does not rise to the level of a "but for" standard.  *Gee*, 289 F.3d at 345.  A "causal link" for a *prima facie* showing is established if evidence shows that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity."  *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001).  "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).  The Supreme Court has noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"  *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001).  The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link.  *See*, *e.g.*, *Bell v. Bank of Am.*, 171 Fed. App'x 442, 444 (5th Cir. 2006) (holding that a seven-month period does not support establish a causal link); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month period does not support an inference of a causal link); *Harvey v. Stringer*, 113 Fed. App'x 629, 631 (5th Cir. 2004) (finding that a ten-month period did not create a causal link); *Stroud*

---

[4]  Cooper does not allege that any of the prior incidents provide a basis for his retaliation claim.  In Cooper's summary judgment response, he includes only a single sentence under the heading "Cooper Clearly Suffered an Adverse Employment Action" in his retaliation section: "It is equally undisputed that Cooper suffered an adverse employment action, namely, that he was terminated on September 20, 2007."  (Docket Entry No. 35 at 21).  In his surreply, Cooper again refers only to termination.

*v. BMC Software, Inc.*, 2008 WL 2325639 (5th Cir. Jun. 6, 2008) (finding that a three-week lapse between protected activity and adverse employment action was sufficient to show a causal link); *Richard v. Cingular Wireless LLC*, 233 Fed. Appx. 334, 338 (5th Cir. 2007) (concluding that two-and-one-half months is a short enough period to support an inference of a causal link); *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that a period of less than sixty days was sufficiently close to establish causal link for *prima facie* case of retaliation); *Ware v. CLECO Power LLC*, 90 Fed. App'x 705, 708 (5th Cir. 2004) (finding a fifteen-day period sufficient to support an inference of causation); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir.2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes" (internal citations omitted)); *see also Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation.").

Cooper filed his charge with the TWC and EEOC on May 1, 2007.  He was fired on September 20, 2007, four and one-half months later.  Cooper has identified no case in which a period of longer than four months has been found to establish a causal link.  Indeed, the cases indicate that after four months – at most – some additional, nontemporal evidence is necessary to support a causation inference.

Cooper argues that Wal Mart's exit-interview colloquy, as recorded by both Paul Peterson and Kay Murphy, provides such evidence.  Peterson's account reads in relevant part:

> I informed [Cooper] that the time had come for us to discuss some of the issues he had brought up over the last few months.  I informed hm that in good faith we had investigated all of his allegations.  Also that the Sealy police and the EEOC had investigated some of the issues as well.  We have seen a pattern of integrity issues with all of the

> allegations.  Then on September 7th you fraudulently requested Dr.
> Desai to conduct a fitness for duty exam at Wal-Marts (sic) expense.
> I informed him that over the past few months he had continued to
> demonstrate integrity issues and that we cannot accept that and we do
> not tolerate integrity issues.  Therefore your (sic) as of now your
> employment is terminated.

(Docket Entry No. 35, Ex. 14).  Murphy's account is not materially different:

> Paul [Peterson] informed [Cooper] that the time had come to talk
> about some of the issues he had brought up to us in the last few
> months.  Paul told him that in good faith we had investigated all of
> his allegations and that the Sealy police and the EEOC had
> investigated his allegations.  We have seen a pattern of integrity
> issues with all of his allegations. On September 7th, he requested a
> psychiatric fitness for duty exam by Dr. Desai and fraudulently
> informed them that Wal-Mart had requested the exam and would pay
> for it.  He has continued to show integrity issues and we do not allow,
> accept, or tolerate integrity issues, therefore, he is terminated as of
> this date.

(*Id.*, Ex. 15).  Dana Fuller testified in her deposition that she told Peterson what to say to Cooper at

the exit interview.  Fuller also testified that she, along with Ed Parish, made the decision to fire

Cooper.  (*Id.*, Ex. 2 at 25, 34).

Cooper argues that these statements are evidence that his EEOC complaint was the true

reason for Wal-Mart's decision to fire him.  Cooper points to the reference to the EEOC

investigation and to Fuller's reference to "a pattern of integrity issues with *all* of Cooper's

allegations, which would include the allegations made to the EEOC."  Cooper argues that because

he was fired due to "these integrity issues," that means he was terminated because he filed his EEOC

complaint.  (Docket Entry No. 35 at 22).

This argument is wholly unpersuasive.  Fuller explained in her deposition what Wal-Mart

meant by "integrity issues": "Mr. Cooper lied.  And considering that he continued to lie over the

course of several months about several different things, that we were no longer going to allow Mr.

Cooper to continue to lie, and be employed with Wal-Mart." (Docket Entry No. 35, Ex. 2 at 34). Wal-Mart had been concerned for an extended period  about the bizarre nature of Cooper's numerous and unsubstantiated allegations, not that he filed a complaint with the EEOC.  Peterson explained that he referred to the EEOC investigation only because Fuller "thought it was important that Mr. Cooper realize that we had done due diligence . . .the Police Department did due diligence, and also that the EEOC had done their diligence." (*Id.* at 34-35).  Because the record does not show any causal link between his EEOC complaint and his job termination, Cooper has not made a *prima facie* showing of retaliation.

Even assuming a *prima facie* showing, the record does not raise a disputed fact issue material to determining retaliation.  Wal-Mart has proffered a legitimate rationale for its decision to fire Cooper: his "integrity issues" and persistent failure to obtain a fitness-for-duty certification from a psychiatrist.  The final "integrity issue" was Cooper's statement to Dr. Desai that Wal-Mart would pay for him to perform a psychiatric evaluation.  The question is whether the record raises a fact issue as to whether Wal-Mart's articulated reason for the employment action was a pretext for retaliation.  *Id.*

The standard of proof at the pretext stage requires the plaintiff to raise a fact issue about whether the adverse employment action would have occurred but for his protected conduct. *Septimus*, 399 F.3d at 607; *Pineda v. United Parcel Serv.*, *Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005).  The United States Supreme Court, in *Reeves v. Sanderson Plumbing Products*, stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . .

31

. on the issue of whether the defendant's explanation is pretextual."  530 U.S. 133, 143, 120 S.Ct. 2097.  (2000).  A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence."  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual).  If the plaintiff can identify evidence the proffered explanation is merely pretextual, that will usually be sufficient to survive summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 146-48, 120 S.Ct. 2097.

Cooper argues that Wal-Mart's "integrity issues" reason is pretextual because he was not, by definition, lying.  Every statement he made, Cooper contends, was either objectively true or a good-faith mistake.  Cooper argues, for example, that when he accused Wal-Mart of tearing his paycheck, it was because there was a rip in the check; when he accused a coworker of contaminating his clothing and baby wipes with poison ivy, it was because he had a skin rash; when he accused a coworker of urinating in the truck, it was because there was a smell; when he accused Hansen of assaulting him using a needle hidden in a ring, it was because he had a wound on his back and felt ill.  In a case involving allegedly retaliatory discharge, however, a plaintiff's subjective belief that he did not engage in wrongdoing is not sufficient.  The issue is whether the undisputed facts show, as a matter of law, that the employer had a good faith, reasonable basis for the discharge.  "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."  *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); *see also  Mire v. Texas Plumbing Supply Co., Inc.*, 286 F. App'x 138, 143–44 (5th Cir. 2008) (unpublished) (per curiam) (holding that the plaintiff's subjective belief that she was right and defendant was wrong, without more, was insufficient to rebut defendant's reasons for the disciplinary action); *Bryant v.*

*Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (stating that the fact that an employer's investigation reaches the wrong conclusion does not show an improper motivation); *Cervantez v. KMGP Services Co., Inc.*, No. 08-11196, Slip Op. at  8-9 (5th Cir. Sep. 16, 2009) (unpublished) (per curiam) ("[A] fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted in good faith."). The nature and number of Cooper's accusations against other Wal-Mart employees, and the internal investigations that repeatedly showed no support for the accusations, are undisputed.  The record shows that, as a matter of law, Wal-Mart had a good faith and reasonable basis to fire Cooper for "integrity" issues.

Cooper argues that there is at least a fact issue as to whether Wal-Mart had authorized him to tell Dr. Desai that it would pay for the psychiatric examination.  Cooper points out that Wal-Mart had required him to obtain the examination and in the past had paid for the doctors who saw him. The record, however, shows that Cooper had not communicated with anyone at Wal-Mart from May 9, 2007 to September 7, 2007, when Wal-Mart received the call from Dr. Desai's office.  (Docket Entry No. 31, Ex. 5, ¶¶ 41-42).  Cooper selected Dr. Desai to perform a psychiatric examination with no notice to, or input from, Wal-Mart.  The previous examinations had taken place with Wal-Mart's advance knowledge and authorization.  Cooper did not obtain authorization from Wal-Mart to state that it would pay for the examination Cooper sought after a four-month period in which he had made no attempt to communicate with Wal-Mart.

Wal-Mart also identified Cooper's prolonged failure obtain a psychiatric fitness for duty evaluation as a basis for the decision to fire him.  Cooper argues that this reason should be given no credence because "it is a new allegation that was not stated in Wal-Mart's termination narratives." (Docket Entry No. 35 at 27).  On this point, Cooper again offers his argument that Peterson's and

Murphy's termination narratives reveal that their true motive was retaliatory. That argument, as discussed above, is not supported by the record. The termination narratives speak in broad terms and are consistent with the later, more detailed, explanation. *See Cervantez*, No. 08-11196, Slip Op. at 9 (holding that "the mere existence of a second, more comprehensive log" of the plaintiff's allegedly improper internet use "does not establish a disputed material fact regarding the truth or falsity of [the employer's] stated ground"). The timing of this explanation does not provide a basis to infer that Wal-Mart is "dissembling to cover up a discriminatory purpose." *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097.

Cooper has not submitted or identified evidence that raises a fact issue as to whether, but for filing his administrative charge, he would have been terminated. Wal-Mart is entitled to summary judgment on Cooper's retaliatory discharge claim.

### D.    The Hostile Work Environment Claim

Cooper also argues that Wal-Mart has violated his rights under § 21.051 of the Texas Labor Code by subjecting him to a hostile work environment. Section 21.051 provides:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1) fails to or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies and employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX. LAB. CODE § 21.051.  Like the antiretaliation provision, this section is also meant to give effect

to the mandates of Title VII.  *See* TEX. LAB. CODE § 21.001(1).  Like Title VII, the Texas statute

makes actionable discrimination because of race (or another protected category) "in connection with

compensation or the *terms, conditions, or privileges* of employment."  TEX. LAB. CODE § 21.051(1).

Using nearly identical language in Title VII,[5] the Supreme Court has held that a claim for a hostile

work environment arises when racial or sexual harassment is so severe and prolonged that it affects

a term, condition, or privilege of employment.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S.

57, 64-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)**;** *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-

23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

      The *prima facie* elements of a hostile work environment claim are that: (1) the plaintiff

belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment

complained of was based on membership in the protected group; (4) the harassment affected a term,

condition, or privilege of employment; and (5) the defendant knew or should have known of the

harassment, yet failed to take prompt remedial action.  *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir.

2002).  Because Cooper alleges that he was harassed, at least in part, by supervisors with immediate

or successively higher authority over him, he must satisfy only the first four elements.  *See*

*Celestine,* 266 F.3d at 353-54 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct.

2275, 141 L.Ed.2d 662 (1998)).  If Cooper makes a *prima facie* showing as to these four elements,

Wal-Mart may avoid vicarious liability for its employees' harassing behavior through the *Faragher*

defense.  *See Faragher*, 524 U.S. at 806-08.  "The defense comprises two necessary elements: (a)

that the employer exercised reasonable care to prevent and correct promptly any sexually harassing

---

[5]  42 U.S.C. § 200e-2(1) makes it an unlawful employment practice to "discriminate against any individual
with respect to his compensation, terms, conditions, or privileges of employment, because of" a protected
characteristic.

behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807.

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 Fed.App'x. 457, 463-464 (5th Cir. 2008) (per curiam) (unpublished). The Supreme Court has explained that courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris,* 510 U.S. at 23. "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)) (quotation marks omitted). The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

In his declaration, Cooper recites a laundry list of allegedly harassing acts by Wal-Mart management and co-workers. Most of the incidents were comments made to him by others in the workplace. Wal-Mart personnel made the following statements while Cooper worked at the Hurricane, Utah Distribution center: (a) in October 2005, Eric Lasher, the general terminal manager said "no guns"; (b) the next month, Lasher said Cooper was going to "run right through this place";

also in November 2005, a coworker said "monkey's dress like that";  (c) in January 2006, Lasher told Cooper that "we didn't have racial problems until you showed up"; (d) that same month, before Cooper went to work in Sealy, where Paul Peterson was general terminal manager, Lasher told Cooper that "Paul Peterson is my peezoe"; (e) also in January 2006, a driver named Don said "I can't be seen riding around with a burnt co-driver"; (f) later that month, in response to a complaint about Don's comment, Julie Winterton, the Human Resources Manager said that "she thought [Cooper] wanted to join the Klan"; and (g) either in December 2005 or January 2006, a "husband and wife team" said "here comes the nigger."  Cooper alleges that after he transferred to Sealy, the following statements were made: (h) in February 2006, a driver asked two other people to ask Cooper for Zig-Zags, which are used for smoking marijuana; (i) the next month, Paul Peterson said "I hoped you learned a lesson" and "we are a family here"; (j) in June 2006, a driver named John (who worked in the Hurricane Distribution Center in Utah) called Cooper a monkey during a phone call; (k) in July or August of 2006, Rob, the operations manager, told Cooper that he "could not hang in his neighborhood": (l) sometime during 2006, Rob told Cooper that his apartment might be on fire; (m) in October 2006, a white driver at one of Wal-Mart's warehouses said the word "nigger"; (n) in December 2006, Charise Lambros from the safety department told Cooper that he "need[s] to be careful"; (o) in January 2007, the dispatch coordinator asked Cooper, "has anybody whipped you yet?"; (p) on April 27, 2007, during Cooper's physical, a driver who was at the doctor's office told Dr. Bing and his nurse to "bury him deep."

The case law on when workplace comments give rise to a hostile work environment claim suggests that, both in terms of the frequency and nature of the remarks made to Cooper, a fact issue might well exist here. *Compare Tademy v. Union Pacific Corp.*, 520 F.3d 1149 (10th Cir. 2008) (finding a fact issue on hostile work environment where various graffiti and cartoons combined with

the words "nigger," "nigger go home," and "hang all niggers and jews" were etched on the employee's locker and the employee found a life-sized noose hanging in the workplace) *with Baker v. FedEx Ground Package System*, *Inc.*, 278 Fed. App'x 322, 329 (5th Cir. 2008) (*s*upervisor's comments to African-American employee that "she did not want to work with people like" employee and that "whites rule" were not sufficiently severe to establish a race-based hostile work environment*)*; *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) (holding that a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive harassment); *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that one two-hour "harangue" by a supervisor and use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend," did not amount to a severe or pervasive working environment); *Elmahdi v. Marriott Hotel Servs.*, *Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (finding occasional racial comments insufficient for a hostile work environment claim).

Some of the Cooper's allegations refer not to comments but to events. Cooper claims that when he transferred to the Sealy Distribution Center, he was forced to sit outside while Kay Murphy and three drivers reviewed Cooper's information on Murphy's computer. He claims that he was forced to attend more orientation sessions and participate in more training than four white drivers who went to orientation. He also claims that he was given less desirable driving assignments. During his time in Sealy, Cooper also claims that he was forced to take a higher number of drug tests than white drivers, that someone tore his paycheck, that someone rubbed posion ivy on his uniform. that someone rubbed poison ivy on his baby wipes, that someone urinated in his truck, and that Rob, the operations manager, punched Cooper on the arm and in the stomach. Finally, Cooper mentions

38

Hansen's conduct that made up the assault claim: four hits on the shoulder spread over three separate occasions, one resulting in spilled coffee and another in a bruise and scab.

Title VII "was only meant to bar conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace."  Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable.  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Shepard v. Comptroller Public of Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).  It is a "demanding" standard that requires proof of severe or pervasive conduct that can be characterized as "extreme."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  In determining whether a work environment is hostile, context matters. *See Oncale*, 523 U.S. at 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Considering the allegations as to the comments and conduct together, the record reveals disputed fact issues material to determining whether Cooper was subjected to race-based harassment that was "extreme" and affected his work performance.  If believed, Cooper's allegations set forth a pervasive pattern of harassment that inhibited him from performing his job.  While the incidents were not particularly severe, they happened repeatedly and frequently.  Cooper's perception of his workplace very well may have – as Wal-Mart contends – differed from its reality; the comments and conduct may not have happened as described.  But whether they did entirely depends on Cooper's credibility, which should be assessed by a jury.  *See Reeves*, 530 U.S. 150-51, 120 S.Ct. 2097.

Some of Cooper's allegations have no basis.  To the extent that Cooper alleged that he was required to attend more training, received less desirable routes, and subjected to  more drug tests than other, white employees, the undisputed evidence in the record shows that his subjective belief

was without basis.    The undisputed summary judgment evidence is that Wal-Mart makes assignments for drivers at Sealy at its centralized facility in Bentonville, Arkansas and that the dispatchers at that facility are unaware of the drivers' names or races.    The dispatchers only know a driver's identification number and assess a driver's workload using information provided by the computers on board each truck.    Dispatchers assign work based on Department of Transportation regulations and driver preferences, as expressed through a bidding system.    Under the bidding system, "the drivers with the longest tenure at *each facility* will usually get their top choices." (Docket Entry No. 31, Ex. 5 at 3).    And Wal-Mart's records showed that Cooper had been asked to take two – not six – drug tests, which Dana Fuller testified was "not a lot." (Docket Entry No. 31, Ex. 2 at 36-37).

To the extent Cooper relies on his allegations that Hansen slapped him on the shoulder twice – once causing him to spill coffee and once through a jacket – these allegations provide no support because a reasonable person would not have been offended by a supervisor's casual slaps on the shoulder.    To the extent Cooper relies on the alleged third assault by Hansen, that allegation does not give rise to a fact issue as to racial harassment.    The evidence shows that Cooper accused Hansen of seeking him out at his own surprise anniversary party to attack him by hitting him in the shoulder to stab him with a sharp object, which Cooper believed was a needle hidden in a ring.    Although credibility judgments cannot enter into the summary judgment analysis, no reasonable jury could find racial harassment based on such a bizarre allegation.    A court may disregard testimony and render judgment as a matter of law when no reasonable jury could find the testimony credible.    *See Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 575 (1985).    "[F]actors other than demeanor and inflection go into the decision whether or not to believe a witness.    Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible

on its face that a reasonable factfinder would not credit it." *Id.* A factual assertion or denial "may

be so utterly implausible in light of conceded or irrefutable evidence that no rational person could

believe it; and if so, there is no need to submit the issue" to a jury. *In re Chavin*, 150 F.3d 726, 728

(7th Cir.1998) (citations omitted). Summary judgment is proper when the nonmoving party's only

evidence is nothing more than "[a]n unsubstantiated or conclusory assertion." *Hugh Symons Group*

*v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (granting summary judgment when the plaintiff

rested only on its own unsubstantiated statement in an interrogatory answer that an amount of money

on an invoice "must have" included payments made to the defendant); *see also Bridgmon v. Array*

*Sys. Corp.*, 325 F.3d 572, 577 (citing *Hugh Symons Group*) ("Apart from his uncorroborated and

conclusory testimony, George has offered no evidence to show that the software used by Array is

the same software that was licensed to Array. Such unsubstantiated or conclusory assertions are

incompetent summary judgment evidence and cannot defeat a motion for summary judgment.").

Other than his own unsubstantiated testimony, Cooper has neither identified nor submitted evidence

that Hansen hid a sharp object such as a needle in a ring, which he used to puncture Cooper's

shoulder. Regardless of the demeanor he might present at trial, Cooper's story is "so implausible

on its face that a reasonable factfinder would not credit it." *See City of Bessemer*, 470 U.S. at 575.


Despite the absence of a factual dispute on these allegations, the record reveals material

issues of fact on all four elements of Cooper's *prima facie* hostile work environment claim. Wal-

Mart argues that it is nonetheless entitled to summary judgment because, as a matter of law, it has

established a *Faragher* defense. *See Faragher*, 524 U.S. at 807. Because this is an affirmative

defense, Wal-Mart has the burden of proof. *See Fontenot*, 780 F.2d at 1194-95 ("Thus, if the

movant bears the burden of proof on an issue . . . he must establish beyond peradventure all of the

essential elements of the claim or defense to warrant judgment in his favor").  To obtain summary judgment on the defense, Wal-Mart must show that there is no issue of disputed fact on any of the following three issues: that it exercised reasonable care to prevent any harassing behavior; that it exercised reasonable care to correct promptly any harassing behavior; and that Cooper "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Wal-Mart] or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

As to the first issue, Wal-Mart has offered its Discrimination and Harassment Policy and its Open Door policy, which, in addition to serving as preventative measures, provide for employees to make complaints in the event of harassment and for management to investigate.  (Docket Entry No. 31, Exs. 10, 11).  Wal-Mart cites to another court's opinion holding the Open Door policy to be an "effective, reasonable means for preventing harassing behavior." *Lawrence v. Wal-Mart Stores, Inc.*, 236 F.Supp.2d 1314, 1327 (M.D.Fla. 2002).  Cooper does not appear to dispute this conclusion.  Cooper does dispute whether Wal-Mart's investigations were sufficient to constitute a prompt response to Cooper's claims.  There is no need to resolve the arguments on that issue.  The record does not permit this court to find, as a matter of law, that Cooper acted unreasonably in failing to take advantage of corrective opportunities.  Cooper repeatedly complained to Wal-Mart management about discrimination at both distribution centers.  The *Faragher* defense is conjunctive. There is at least a fact issue as to the third element.

Cooper has created material disputes of fact on all of the elements of his *prima facie* case and Wal-Mart has not demonstrated the absence of fact issues on its affirmative defense.  Wal-Mart's motion for summary judgment on the hostile work environment claim is denied.

### E.    The Disparate Treatment Claim

Wal-Mart moved for summary judgment on both the disparate treatment and hostile work environment claims. Cooper did not address the disparate treatment arguments in summary judgment briefing. To the extent that Cooper is asserting a disparate treatment claim, it fails as a matter of law.

Disparate treatment, or intentional discrimination, can be proven by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir. 2000). Evidence is "direct" if it would prove the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted). If no direct evidence exists, the court uses the same *McDonnell Dougla*s burden-shifting framework that applied to the retaliation claim. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817. Under *McDonnell Douglas,* a plaintiff alleging discrimination must first make a *prima facie* showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) an adverse employment action was taken; and (3) others similarly situated – but outside the protected group – were treated more favorably. *See id.*; *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir. 2005). If the plaintiff makes the *prima facie* showing, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision. *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004); *see generally, Crawford v. U.S. Dept. of Homeland Sec.*, 245 Fed.App'x 369, 377-378 (5th Cir. 2007). The pretext inquiry can be satisfied by showing that Wal-Mart's proffered

43

reason is not worthy of credence, or that some other reason is more likely.  *See Reeves*, 530 U.S. at 146-48, 120 S.Ct. 2097.  In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid*, 376 F.3d at 312.  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

Cooper has produced no direct evidence of discrimination.  To serve as direct evidence of an employer's discriminatory intent, a workplace comment must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [race] was an impermissible factor in the decision to terminate the employee."  *See Equal Employment Opportunity Comm'n v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996).

In *Jones v. Overnite Transp. Co.*, 212 Fed. App'x 268, 273 (5th Cir. 2006), the court held that racially biased comments were not direct evidence of discrimination.  The plaintiff, a dock worker at a transportation company, allegedly overheard a supervisor state that he wanted to "get rid of all the blacks" and "fire a bunch of niggers."  *Id.*  The plaintiff's employment was terminated a few months after these comments.  *Id.*  The court held that although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination."  *Id.*  The court also considered evidence that the same supervisor had requested a staffing agency to send white drivers instead of black drivers.  *Id.*  The court held that this statement was not direct evidence of discrimination because it did not relate to the plaintiff's former employment as a dock worker and required the trier of fact to infer a nexus between the statement and plaintiff's termination.  *Id.*; s*ee also Haas v. ADVO Sys.*, *Inc.*, 168 F.3d

44

732, 733 (5th Cir. 1999) (holding that a job interviewer's statement that the plaintiff's age caused him "concern" was not direct evidence of age discrimination in the employer's decision not to hire plaintiff because an additional inference of discrimination was required).

By contrast, in *Jones v. Robinson Prop. Group*, *L.P.*, 427 F.3d 987 (5th Cir. 2005), the court found racially biased comments to be direct evidence of race discrimination. In that case, an African-American applicant was not hired for the position of casino poker dealer. Several witnesses testified that the decisionmakers for the casino's poker room were "using race as a factor in employment decisions." *Id.* at 993. The decisionmakers made comments to witnesses that "these good old white boys don't want black people touching their cards," and "maybe I've been told not to hire too many blacks in the poker room." *Id.* at 990-91. Because these race-based comments related directly to the decision whether to hire African-Americans, the court concluded that the comments were direct evidence of the plaintiff's claim. *Id.*; *see also Cross v. FPP Operating Partners*, 2001 WL 1143159, at *7 (N.D. Tex. Sep. 25, 2001) (supervisor's comment allegedly made to white subordinate employees that "no fucking niggers were going to work in her store, especially niggers from Electra" was direct evidence of discrimination); *Bowe v. Exide Corp.*, 2001 WL 705881, at *3 n. 1 (N.D. Tex. June 18, 2001) ("[Direct] evidence typically involves statements made by the employer or certain of its personnel that indicate that an employment decision was based on a forbidden factor.").

The comments recounted in Cooper's declaration come nowhere close to those in *Robinson* and fall short even of those in *Overnite Transport*, which the Fifth Circuit found not to be direct evidence. Although some of the statements are offensively racially charged, none speak directly to employer efforts to take actions on account of race. A judge or jury would have to "infer a nexus"

to reach the conclusion that any actions taken against Cooper were racially motivated.  *See Overnite Transport*, 212 Fed. App'x at 273.

With no direct evidence of discriminatory intent, the analysis moves to the *McDonnell Douglas* burden-shifting framework.  The first step is Cooper's *prima facie* case, in which he has the burden to show that: (1) he belongs to a protected group; (2) he was qualified for his position; (3) an adverse employment action was taken; and (4) others similarly situated outside the protected group were treated more favorably.  *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).  As an African-American, Cooper belongs to a protected group.  As to the second element, Wal-Mart stated in an answer to an interrogatory:  "Cooper was not qualified for the position at the time of his termination. He had become unqualified on or around March 15, 2007, when he was disqualified from driving by Dr. Mark Bing for suffering from unexplained dizziness and Dr. Bing recommended that Cooper be given a psychiatric evaluation. Wal-Mart believed that Cooper was not qualified because he was unable to provide a psychiatric fitness for duty release."  (Docket Entry No. 35, Ex. 11).  Whether the second element is met depends on the particular adverse employment action in question and the point in time  at which it occurred.  To the extent Cooper's claim is based on the work assignments he received on arriving at Sealy, there is no dispute that, at that time, he was qualified for the assignments he preferred.

Wal-Mart targets the third element of Cooper's *prima facie* case, arguing that there were no "actionable adverse employment actions" other than his job termination.  (Docket Entry No. 31 at 6).  Although Cooper complained that he received less pay at Sealy than he had received before he transferred from Utah, the undisputed evidence is that his Average Day's Pay increased when he transferred to Sealy.  (Docket Entry No. 31, Statement of Undisputed Facts ¶ 35).  Cooper's

46

termination should not be considered, Wal-Mart argues, because Cooper has not exhausted administrative remedies on his termination claim. Because the EEOC completed its investigation before Cooper was terminated and the TWC simply adopted the EEOC's findings, Cooper's termination was not part of the agency investigation. The six-day period between Wal-Mart firing Cooper and the TWC issuing its right to sue letter does not change the analysis because the TWC did not conduct an independent investigation. *See Felder*, 229 F.3d at 1147. Wal-Mart is correct that Cooper has not exhausted his administrative remedies on his discriminatory discharge claim.

Alternatively, Cooper's claim that Wal-Mart's decision to fire him was racially motivated cannot survive summary judgment. Wal-Mart has articulated nondiscriminatory reasons for the discharge decision: Cooper's lack of credibility and integrity arising from his bizarre accusations, which was confirmed by his statement to Dr. Desai's office that Wal-Mart would pay for an examination and Cooper's prolonged failure to comply with the requirement to obtain a fitness for return to duty examination. As discussed in detail in the context of the retaliation allegation, the summary judgment evidence does not show disputed fact issues material to determining pretext or motive. The undisputed competent summary judgment evidence shows that, as a matter of law, Wal-Mart had a reasonable and good-faith basis for believing that Cooper had repeatedly made false and bizarre accusations against coworkers and Wal-Mart managers and that he had failed for a prolonged period to obtain an examination that would enable him to return to duty.

Cooper's allegations about racially disparate route assignments and mileage fall short of the adverse employment action standard because they are not "ultimate employment decisions." *See Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir.1995), *abrogated in part on other grounds by*

*Burlington Northern*, 548 U.S. 53, 67, 126 S.Ct. 2405.[6]  "Title VIII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."  *Id.*  Ultimate employment decisions  include "hiring, firing, granting leave, discharging, promoting, and compensating."  *Id.* at 782.   Route assignments and mileage allocations do not fall into this category.  *See Jeffrey v. Dallas County Medical Exam'r*, 37 F.Supp.2d 525, 529 (N.D. Tex. 1999) (citing *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998)) ("Changing an employee's work schedule, hours, or increasing an employee's workload are merely administrative decisions and do not constitute the type of ultimate employment decisions contemplated by Title VII.").  Moreover, Cooper has not identified or submitted competent evidence that similarly situated persons were treated differently.

Finally, Wal-Mart has articulated a legitimate, nondiscriminatory reason for its work assignments and no evidence in the record supports an inference that Wal-Mart's proffered reason is either a pretext for discrimination or only one among multiple reasons for the decision.  *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.  The undisputed summary judgment evidence is that Wal-Mart makes assignments for its drivers at Sealy at its centralized facility in Bentonville, Arkansas.  The dispatchers at that facility are unaware of the driver's name or race.  They know each driver only by his or her identification number and assess a driver's workload using information provided by the computers on board each truck.  Dispatchers assign work based on Department of

---

[6]  In *Burlington Northern*, the Supreme Court held that the "adverse employment action" requirement on retaliation claims was subject to a looser standard than the "adverse employment action" element of the *prima facie* showing in a disparate treatment claim.  Before that time, the Fifth Circuit treated the two standards identically.  *Dollis* was a retaliation case.  Although its interpretation of an adverse employment action is no longer valid with respect to retaliation claims, it still controls for disparate treatment claims.  *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007) ("Even though our precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for Title VII discrimination claims and therefore continues to justify summary judgment dismissal of McCoy's discrimination claims,  her retaliation claims requires a closer look post- *Burlington Northern*.").

48

Transportation regulations and driver preferences, as expressed through a bidding system.  Under the bidding system, "the drivers with the longest tenure at *each facility* will usually get their top choices." (Docket Entry No. 31, Ex. 5 at 3).  Wal-Mart's legitimate, nondiscriminatory explanation for Cooper's work assignments is his lack of seniority at the Sealy facility.  The competent summary judgment evidence does not raise a fact issue about whether: (1) the reason is not true, but is instead a pretext for discrimination; or (2) the reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the  decision.  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004);  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 141, 120 S.Ct. 2097.

The evidence of the race-related comments made by some coworkers and supervisors does not raise such a fact issue.  Under the more relaxed approach in the Fifth Circuit to determining whether racially offensive remarks are probative of discriminatory intent, *see Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) (holding that workplace remarks sufficed as circumstantial evidence from which inference of discriminatory intent could be drawn even though comments were "stray remarks" under the *CSC Logic* test); *Gillaspy v. Dallas Independent School Dist.*, 278 Fed. App'x 307, 313 (5th Cir. 2008); *Jenkins v. Methodist Hospitals of Dallas, Inc.,* 478 F.3d 255 (5th Cir. 2007), a plaintiff wishing to use workplace remarks as circumstantial evidence of employment discrimination need only show that the remarks demonstrate discriminatory animus on the part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision maker.  *Laxton*, 333 F.3d at 583; *Sandstad*, 309 F.3d at 899; *Russell*, 235 F.3d at 225; *see also Phillips v. TXU Corp.*, 194 Fed. App'x 221, 228 (5th Cir. 2006) (holding that "[a] remark is considered probative of discrimination if it demonstrates discriminatory animus and was made by a person primarily responsible for the adverse

employment action or by a person with influence or leverage over the formal decisionmaker.").  But even under the more relaxed standard, the remarks cannot be the only evidence of pretext.  *Phillips v. TXU Corp.*, 194 Fed. App'x at 228 (citing *Palasota v.Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir.2003)("After *Reeves* . . . so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent").

In the present case, even assuming that the more relaxed test under *Laxton* applies, there is no evidence of discriminatory intent outside of the stray remarks made within the workplace.  More importantly, none of the alleged comments were made by those employees responsible for setting Cooper's work assignments: the dispatchers in Bentonville, Arkansas.

To the extent that Cooper has alleged disparate treatment, he has failed to create a genuine issue of material fact on that claim.  Wal-Mart is entitled to summary judgment on Cooper's disparate treatment claim.

### F.    The Assault Claim

Wal-Mart moves for summary judgment on Cooper's assault claim on three grounds:   (1) the competent summary judgment evidence shows that as a matter of law, Hansen's conduct was not an assault; (2) Wal-Mart is not vicariously liable because Hansen's acts were outside the scope of his employment; and (3) the Texas Worker's Compensation Act is the sole basis for bringing the claim.  (Docket Entry No. 31 at 21-23).  Cooper has responded to each ground.  (Docket Entry No. 35 at 10-14).

Under Texas law, a person commits assault if he intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.  *See* TEX. PEN. CODE § 22.01(a)(3); *Umana v. Kroger Texas, L.P.*, 239 S.W.3d 434, 435 (Tex. App.–Dallas 2007, no pet.) ("The elements for civil assault mirror

those required for criminal assault.").  The summary judgment evidence is that Cooper subjectively

viewed Hansen's contact as offensive or provocative.  The parties disagree, however, as to whether

Hansen knew or had reason to know that Cooper would regard the contact as offensive or

provocative.

Cooper alleges that the first time Hansen slapped him on the shoulder, it was in the context

of a casual encounter but was forceful enough to cause him to spill  coffee from the cup he was

holding.  Hansen's declaration is part of the summary judgment record.  In it, Hansen stated that he

supervises approximately 1,200 employees, and that as part of his job:

> I make periodic visits to each distribution center where I meet with
> office associates and drivers. During these visits, I often meet several
> drivers and engage in friendly conversation with them. While
> engaging in this friendly conversation, I often shake the drivers'
> hands and/or pat them on the shoulder or back.  I have never believed
> nor have I had any reason to believe that any driver would regard any
> of this contact to be offensive or provocative.

(Docket Entry No. 31, Ex. 8 at 1).  Cooper does not dispute the description of the context in which

Hansen slapped him on the shoulder.  The fact that Cooper spilled coffee does not raise a fact issue

as to whether the casual slap amounted to an assault.  Cooper's only argument, that "[a]ny person

would know that if they hit someone hard enough to spill coffee, that said person would find the

contact offensive or provocative," (Docket Entry No. 35 at 12), is unpersuasive; under this

argument, many coffee spills would become criminal conduct.

The second alleged incident involved Hansen "smack[ing] Cooper on the shoulder twice."

(*Id.*)  In his deposition, Cooper described the contact as "[j]ust – you know how you hit somebody

on the back of the shoulder."  (*Id.*, Ex. 1, Cooper Depo. at 103).  Cooper testified that he felt no pain

and did not say anything to Hansen afterward.  (*Id.* at 104).  Hansen testified that he "patted

[Cooper] on the shoulder in what I believed was a friendly and courteous manner" while talking

about safe driving in the parking lot.  (Docket Entry No 31, Ex. 8 at 2).  Cooper's own description

of the contact precludes any inference that it was an assault under Texas law.

The third incident happened later the same day, after a meeting about defensive driving.

Cooper alleged that Hansen approached and hit him on the shoulder or back.  After the contact,

Cooper testified, he felt a stinging sensation that would not dissipate.  Cooper described Hansen's

demeanor at the time as "sinister," claiming he "looked like an angry, old, racist white man."

(Docket Entry No. 31, Ex.1, Cooper Depo. at 105-108).  Cooper's shoulder bruised and eventually

formed a scab.  He also became ill and went to a V.A. hospital, where a doctor apparently prescribed

a course of antibiotics or a tetanus shot.  Cooper believes his illness was related to Hansen's hitting

him on the shoulder, possibly because Hansen stuck Cooper with a concealed needle.  Cooper

testified in his deposition: "You know, whether it was a ring or something, I don't know, but I felt

a sting and it left a nasty bruise and I got very sick."  (*Id.* at 112).  After going to the V.A. hospital,

Cooper reported the alleged assault to Wal-Mart.  When he did so, it was two weeks after the

incident.  He testified that he delayed because he "didn't know what was wrong with [him]."  (*Id.*

at 113).  Wal-Mart sent Cooper to Dr. Bing's office, where he told the  nurse practitioner that the

lesion on his shoulder was from a bug bite.  (Docket Entry No. 31, Ex.5, ¶ 30).  According to

Hansen, there was a small surprise party after the meeting to celebrate Hansen's 20-year anniversary

with Wal-Mart.  Hansen shared cake with about 15 drivers, one of whom was Cooper.  Hansen does

"not recall having any specific interaction with Mr. Cooper at the time" but remembers that Cooper

was "generally smiling."  (Docket Entry No. 31, Ex. 8 at 2).

Although credibility determinations ordinarily should be left for trial, a court may disregard

testimony and render judgment as a matter of law when no reasonable jury could find the testimony

credible.  *See City of Bessemer*, 470 U.S. at 575.  "[F]actors other than demeanor and inflection go

into the decision whether or not to believe a witness.  Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id.*  Even when an appellate court reviews a factual finding pertaining to credibility under a clear-error standard, it may vacate if it finds that such factors are present. *Id.*  A factual assertion or denial "may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no need to submit the issue" to a jury. *Chavin*, 150 F.3d at 728 (citations omitted).  Summary judgment is proper when the nonmoving party's only evidence is nothing more than "[a]n unsubstantiated or conclusory assertion." *Hugh Symons Group*, 292 F.3d at 470 (granting summary judgment when the plaintiff rested only on its own unsubstantiated statement in an interrogatory answer that an amount of money on an invoice "must have" included payments made to the defendant); *see also Bridgmon*, 325 F.3d at 577 (citing *Hugh Symons Group*) ("Apart from his uncorroborated and conclusory testimony, George has offered no evidence to show that the software used by Array is the same software that was licensed to Array.  Such unsubstantiated or conclusory assertions are incompetent summary judgment evidence and cannot defeat a motion for summary judgment.").

Other than his own unsubstantiated accusation and speculation, Cooper points to no evidence that Hansen had a ring with a concealed needle that he used to stab Cooper while appearing to be delivering a friendly shoulder slap.  Regardless of the demeanor with which he might present it at trial, Cooper's story is "so implausible on its face that a reasonable factfinder would not credit it." *See City of Bessemer*, 470 U.S. at 575.  It is undisputed that none of the twenty other drivers present

53

noticed anything unusual during the party.  Cooper has failed to create a factual dispute with respect to this third incident as well.[7]

---

[7]     Wal-Mart argues that even if Hansen had assaulted Cooper, it would not be liable because Hansen was not acting in the scope of his employment at the time.  Cooper relies on the Texas common law vice-principal doctrine.  *See Ft. Worth Elevators Co. v. Russell*, 70 S.W.2d 397 (Tex. 1934).  A person is only a vice-principal if they "enjoy a measure of authority sufficient to enable one to consider his acts as those of the company." *Garrett v. Great Western Distributing Co.*, 129 S.W.3d 797, 802 (Tex.App.-Amarillo 2004, pet. denied) (citations omitted).   A vice-principal must be one of four types of employees:  "(1) corporate officers; (2) those with authority to employ, direct, and discharge employees; (3) those engaged in the performance of non-delegable or absolute duties of the employer; and (4) those to whom an employer has confided the management of the whole business or a department or division of the business." *Id.*   Even if an employee falls within one of the four categories, their liability will only be imputed to the employer if "the tortious act was encompassed within the duties assigned." *Id.*; *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 744 (Tex. App.-Houston 1981, no writ) ("We hold that the liability of a corporation for the acts of its vice principal is not absolute but is limited to those acts which are referable to the company's business to which the vice principal is expressly, impliedly or apparently authorized to transact. The fact that a corporation might indirectly or incidentally benefit from such unauthorized acts would not, standing alone, render a corporation liable.").  The record evidence does not allow this court to hold that Hansen is not Wal-Mart's vice-principal.  He appears to fall within the second of the four categories: those with authority to employ, direct, and discharge employees.  *See Garrett*, 129 S.W.3d at 801.  Wal-Mart stated in an interrogatory answer that "[d]uring the course of [Cooper's] employment, Michael Hansen was a Regional Transportation Manager. Hansen had the power to hire, fire, and/or direct subordinates."

      Hansen's vice-principal status could make Wal-Mart liable only if Hansen's acts are "referable to the business [he] is expressly, impliedly or apparently authorized to transact."  Wal-Mart argues that his acts do not satisfy this test because assaulting employees is not one of the duties assigned to Hansen by Wal-Mart.  The relevant inquiry, however, is not whether the offensive conduct was specifically assigned to the vice-principal, but instead whether it is referable to his job duties.  Hansen was charged with the supervision of 1,200 employees.  Part of his job was to engage with drivers on a friendly, conversational level.  Shaking drivers' hands and hitting drivers on the shoulders was one of the means he used to carry out that responsibility.  On this record, the vice-principal doctrine does not appear to shield Wal-Mart from liability.

      Wal-Mart's final argument on the assault claim is that this court may not properly exercise subject-matter jurisdiction because the claim is subject to the Texas Workers' Compensation Act (TWCA).  The TWCA provides:

> Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.

Tex. Lab. Code § 408.001(a).  Cooper argues instead that Hansen's conduct falls under the TWCA's intentional tort exception, which is a byproduct of the Texas Constitution's Open Courts Clause. *See* Tex. Const. art. 1, § 13 (prohibiting statutes that exempt common law liability for intentional injuries).  That exception from TWCA's exclusivity is narrow. *Urdiales v. Concord Techs. Del. Inc.*, 120 S.W.3d 400, 405-07 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).  "It would disturb the balance the Workers' Compensation Act achieved if we allowed an employee, injured by the intentional tort of a co-employee, to sue and recover from their employer simply because the tort was committed (1) at work (2) by an employee of the company." *Id.* at 407.  The Texas Supreme Court has declined to craft "a rule for determining when

Wal-Mart is entitled to summary judgment on Cooper's assault claim.

**IV. Conclusion**

This court denies Wal-Mart's motion for summary judgment on the hostile work environment claim but otherwise grants Wal-Mart's motion for summary judgment. Both of Wal-Mart's motions to strike witnesses are granted.

The parties are ordered to appear for a status conference on **Thursday, October 15 at 3:30 p.m.** in Courtroom 11-B to set a schedule and trial date.

SIGNED on September 24, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

conduct of a corporate agent will be attributable to the corporation for purposes of applying the [intentional tort] exception." *Medina v. Herrera*, 927 S.W.2d 597, 601 (Tex. 1996). Because this court has concluded that Wal-Mart is entitled to summary judgment on Cooper's assault claim, it is unnecessary to decide the proper test for imputing an employee's conduct to an employer for purposes of the intentional tort exception or whether Hansen's alleged assault meets that test.