**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LEANDROS COOPER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0085 |
| | § | |
| WAL-MART TRANSPORTATION, LLC | § | |
| and WAL-MART STORES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Leandros Cooper formerly worked as a truck driver for Wal-Mart Transportation, LLC and Wal-Mart Stores, Inc. (together "Wal-Mart"). Cooper sued Wal-Mart for employment discrimination. Following discovery, rulings on pretrial motions left the claim that he was subjected to a racially hostile work environment. After a trial on that claim, the jury was unable to reach a verdict and this court declared a mistrial. Wal-Mart renewed its motion for judgment as a matter of law, arguing that based on the full trial record, no reasonable jury could find that there was a hostile work environment. (Docket Entry Nos. 71, 72). Cooper has responded, arguing that another jury trial is required. (Docket Entry No. 77).[1] Based on careful consideration of the motion and response and materials submitted in support; the testimony and exhibits presented at trial; and the applicable law, this court grants Wal-Mart's motion for judgment as a matter of law. Final judgment is entered by separate order. The reasons are explained below.

---

[1] After the mistrial and Wal-Mart's renewed motion for judgment as a matter of law, Cooper's lawyers moved to withdraw, citing irreconcilable differences with their client relating to the case. This court required Cooper's lawyers to file a response to Wal-Mart's motion for judgment as a matter of law and then granted the motion for withdrawal.

## I.     Background

The factual evidence in the summary judgment record is described in detail in this court's September 24, 2009 Memorandum and Order granting in part and denying in part Wal-Mart's motion for summary judgment.  (Docket Entry No. 40 at 2-16); *Cooper v. Wal-Mart Transp., LLC*, 662 F.Supp.2d 757, 761-70 (S.D. Tex. 2009).  In that opinion, this court granted partial summary judgment, leaving for trial Cooper's allegation that he had been subjected to race-based harassment while working at two Wal-Mart locations.  A jury trial was held in January 2010.  Testimony and exhibits presented at trial have provided a fuller record than this court had on summary judgment. The evidence and arguments are summarized here.

Cooper began working as an interregional truck driver for Wal-Mart on October 4, 2005. (Docket Entry No. 31, Ex. 1 at 75, Ex. 5 at ¶ 2).  During the first several months of his employment, Cooper worked from Wal-Mart's distribution center in Hurricane, Utah.  (*Id.*).  He later asked for, and received, a transfer to the Sealy, Texas distribution center, giving as his reason his desire to move to Texas.  Cooper worked at the Texas location from January 27, 2006 to September 20, 2007, when he was fired.  (Docket Entry No. 35, Ex. 3).

Cooper was on paid medical leave for the last several months of his employment.  On February 15, 2007, he told Wal-Mart that, two weeks earlier, he had been "assaulted" by Mike Hansen, a senior member of Wal-Mart management.  Cooper told Wal-Mart that Hansen had slapped his shoulder at a company gathering, using a sharp object such as a hypodermic needle hidden in a ring to inject a poison, which made Cooper ill.  Wal-Mart investigated the allegations.  Wal-Mart's worker's compensation representative took a statement from Cooper, in which he said that his head, neck, and shoulder were injured, his vision was blurred, and "his brain was all out of whack."

(Docket Entry No. 31, Ex. 5, ¶ 25).  Based on this information, Regional Human Resources manager Dana Fuller decided to remove Cooper from active duty effective February 15, 2007, placing him on paid medical leave and requiring a fitness-for-duty examination before returning to work.  (*Id.*).

Wal-Mart also talked to others present at the party.  None of the approximately 20 witnesses could corroborate Cooper's story about the "assault."  On February 19, 2007, Cooper submitted a sworn statement to the police, accusing Hansen of inflicting a puncture wound.  (Docket Entry No. 35, Ex. 1 at 115-17).  Wal-Mart asked Cooper to see a doctor for a physical to determine if he was fit for duty.  The doctor, Mark Bing, was "the doctor who provided Department of Transportation fitness for duty examinations for all truck drivers operating out of the Sealy Distribution Center." (*Id.*, Ex. 5, ¶ 29).  On his first visit, around February 23, 2007, Cooper saw a nurse practitioner, who examined him.  Cooper told the nurse practitioner that the injury on his shoulder was from a bug bite and left the office before Dr. Bing could see him.  (Docket Entry No. 31, Ex. 7 at 3).  Wal-Mart instructed Cooper to return to see Dr. Bing.  The doctor examined Cooper, conducted an MRI, and ordered a series of tests.  Dr. Bing found that Cooper was disqualified from work for 60 days.  Dr. Bing communicated his findings to Wal-Mart in a March 14, 2007 letter, noting a particular concern about unexplained dizziness.  (*Id.*, Ex. 6, Attachment B).  Dr. Bing also contacted Murphy and suggested that Cooper be given a psychological evaluation.  (*Id.*, Ex. 5, ¶ 33).  On March 21, Fuller notified Cooper that Wal-Mart was concerned about his mental health and safety, and the safety of others.  Fuller told Cooper that, in addition to the 60-day medical disqualification from work, he needed to submit to a psychological fitness-for-duty exam in order to return to work.  (*Id.*, ¶ 34).  Cooper declined opportunities to receive such an evaluation and was not in contact with Wal-Mart between April 2007 and September 2007.  On September 19, 2007, he obtained a fitness-for-duty letter, misrepresenting to the psychiatrist that Wal-Mart would pay for the examination.  Wal-Mart

decided to terminate Cooper's employment because of "integrity issues," which was communicated to him in a September 20, 2007 exit interview.

In his lawsuit, Cooper claimed that his firing constituted race discrimination and retaliation. These allegations were not presented to the jury because this court found, as a matter of law, that Cooper could not make out a *prima facie* case of discrimination or retaliation and that Wal-Mart had legitimate reasons for firing him. (Docket Entry No. 40).

In the lawsuit, Cooper also alleged that he had been subjected to a variety of racially discriminatory and harassing acts ranging from being required to submit to more drug tests than other drivers to receiving less desirable route assignments to being paid less than other drivers. This court carefully examined the undisputed summary judgment evidence on these allegations and concluded that as a matter of law, Cooper could not recover. The only claim that proceeded to trial was that Cooper had been subjected to a racially hostile work environment.

Cooper has testified about statements and events that he asserts were all racially motivated. According to Cooper, Wal-Mart personnel made the following statements while Cooper worked in Hurricane, Utah: (1) in October 2005, during a new employee orientation, Eric Lasher, the General Transportation Manager said "no guns"; (2) the next month, Lasher said that Cooper was going to "run right through this place"; (3) also in November 2005, an unidentified coworker said "monkeys dress like that"; (4) in January 2006, Lasher told Cooper that "we didn't have racial problems until you showed up"; (5) that same month, before Cooper went to work in Sealy, where Paul Peterson was general terminal manager, Lasher told Cooper that "Paul Peterson is my peezoe," which Cooper testified was equivalent to describing someone as "family" and which he took as a threat; (6) also in January 2006, after Cooper had reported a fire in his truck, his codriver, Don Wishon, said "I can't be seen riding around with a burnt co-driver"; (7) later that month, Julie Winterton, the Human

Resources Manager said that "she thought [Cooper] wanted to join the Klan"; and (8) either in December 2005 or January 2006, a "husband and wife team" said "here comes the nigger."

Cooper testified about the following statements and events after he transferred to the distribution center in Sealy, Texas: (9) in February 2006, a driver asked two other people to ask Cooper for "Zig-Zag" cigarette rolling papers; (10) the next month, Paul Peterson said "I hoped you learned a lesson" and "we are a family here"; (11) in May 2006, Human Resources Manager Kay Murphy said "they should not try to run people off, they should let them leave on their own"; (12) in June 2006, a driver named John (who worked in the Hurricane Distribution Center in Utah) blurted out the word "monkey" during a phone call; (13) in July or August of 2006, Rob Bruhnke, the Operations Manager, told Cooper that he "could not hang in his neighborhood"; (14) sometime during 2006, after a news report of a fire in Katy, Texas, Bruhnke told Cooper that his apartment, located in Katy, might be on fire; (15) in October 2006, a white driver at Wal-Mart's distribution center in Palestine, Texas said the word "nigger"; (16) in December 2006, Charise Lambros from the safety department told Cooper that he "need[s] to be careful"; (17) in January 2007, Driver Coordinator Ruth Johnson asked Cooper, "has anybody whipped you yet?"; (18) on April 27, 2007, during Cooper's physical, another driver who was also in the waiting room at the doctor's office told Dr. Bing and his nurse to "bury him deep"; and (19) in May 2007, Regional Human Resources Manager Dana Fuller told Cooper "Wal-Mart is liable, do you know what this says about management?"; (20) "someone" tore his paycheck in 2006; (21) Bruhnke punched him in the arm and stomach in 2006; (22) in December 2006, "someone" rubbed poison ivy on Cooper's uniform and on the baby wipes he kept in his truck; (23) there was a smell in his truck cab in February 2007 that Cooper thought was caused by someone urinating in the cab; and (24) once near the end of 2006 and twice on January 31, 2007, Hansen, the regional manager, "assaulted" Cooper, including

5

stabbing him with a needle hidden in a ring, injecting a poison. Cooper's version of many of these statements and events were vigorously disputed by Wal-Mart witnesses at trial.

During the trial, Cooper was asked why he believed that the statements and actions that were not obviously race-based were in fact racially motivated. He generally testified that he thought all the comments and acts were racially biased because he was African-American and the speaker was white. Cooper offered more specific explanations for why he believed some of the statements were racially offensive. Cooper stated that Lasher's "no guns" remark at the Hurricane new hire orientation session was racist because it was based on "the stereotype that African-American males carry guns, and that, you know, we are violent with our firearms." (Tr. of Jan. 15, 2010 Evidentiary Hearing at 7:4-6). But the record shows that Wal-Mart had a strict policy against drivers carrying guns, which was posted in signs prominently displayed at the Hurricane facility, and the statement was made in a general new hire orientation session attended by white as well as black drivers. (*Id.* at 12:3-17). Cooper testified that he believed that the "burnt co-driver" statement made by Wishon, his fellow driver, referred to skin color. The record shows that Wishon made this statement after a fire in the truck he and Cooper drove. Cooper testified that he believed that Bruhnke's comment about his neighborhood was racist because they were talking about growing up in Chicago and Cooper thought Bruhnke had grown up in a predominantly white neighborhood and Cooper had grown up in the largely African-American south side. (Jan. 19, 2010 Trial Tr. at 31:24-34:21). Cooper testified at trial that the telephone call with "John" in which the word "monkey" was used was racist but acknowledged that he and John were friends and that they were having a friendly conversation. (Jan. 19, 2010 Trial Tr. at 38:14-41:1).

There is also evidence in the record about complaints Cooper made during his employment at Wal-Mart. Cooper testified that in November 2005, while he was working in Hurricane, he

complained to Michael DiGioa, an Operations Manager at Hurricane, about a white driver saying "monkeys dress like that." Cooper testified that no action was taken in response. (Jan 15, 2010 Trial Tr. at 16:17-17:4). While working in Hurricane, Cooper also complained to Julie Winterton, the Human Resources Manager there, about Wishon's "burnt co-driver statement." Wal-Mart witnesses Winterton and Eric Lasher, the Hurricane General Transportation Manager, testified that they promptly investigated this complaint, speaking to both Cooper and Wishon, and that they found no basis for any race discrimination. When Cooper asked to transfer to Texas, Wal-Mart granted the request despite the fact that under company policy, he had not worked long enough to be eligible for a transfer. Cooper did not cite racial harassment as a reason for requesting the transfer.

In September or October of 2006, while working in Sealy, Cooper complained to Dana Fuller about his route assignments, his pay, the number of miles assigned to him, and the number of drug screenings he was asked to take. (Docket Entry No. 35, Ex. 3, Cooper Decl, ¶¶ 2-4). There is no evidence that Cooper complained that these were race-based. This court addressed these claims on summary judgment and found that the undisputed evidence showed that the events did not happen as Cooper believed or that, as a matter of law, they were neither discriminatory nor harassing. (Docket Entry No. 40 at 39-40). Cooper also complained to Fuller that someone deliberately tore a corner off his pay stub, although he did not tell Wal-Mart that he believed it was a racist act. Fuller testified that she investigated by speaking to Kay Murphy in Sealy, to whom Cooper had also reported the torn pay stub. (Jan. 19, 2010 Trial Tr. at 116:10-119:22). Cooper testified that when he reported the torn pay stub, Murphy explained to him that all of the pay stubs were processed at Wal-Mart headquarters in Bentonville, Arkansas. Cooper testified at trial that he still believes someone in Sealy tore the pay check. He stated at trial that he did not tell Wal-Mart who he believed

tore the check stub and testified that he has no evidence to support his belief that the check was torn because of his race.  (Jan 15, 2010 Trial Tr. at 109:11-110:22).

Cooper testified at trial that, after his transfer to Sealy, he complained to Fuller that he had developed a skin rash, which he attributed to "someone" contaminating his uniform and baby wipes by rubbing them with poison ivy.  Cooper did not identify this as racial.  Paul Peterson testified at trial that Cooper complained that he believed someone had put poison ivy on his uniform and baby wipes and that a smell in his truck meant that someone had deliberately urinated in it.  Peterson testified that he could not and did not investigate this complaint because Cooper did not suggest any possible suspect.  Cooper did identify race in his complaint.  Wal-Mart suggested that Cooper take such steps as changing his detergent to address the skin rash and offered to replace his baby wipes.

Cooper testified that two weeks after he was "stabbed" by a sharp object hidden in a ring worn by Mike Hansen, a Wal-Mart Regional Transportation Manager, he complained about this "assault" as well as two other instances in which he was "attacked" by Hansen.  (Tr. of Jan. 15, 2010 Evidentiary Hearing at 41:15-42:16).  One of those "assaults" jostled Cooper's arm and caused him to spill coffee.  Fuller investigated and found no evidence that the "assaults" had occurred as Cooper alleged.[2]  (Jan. 19, 2010 Trial Tr. at 128:3-10).

Cooper testified at trial that he placed two calls to a toll-free number Wal-Mart provided for reporting ethics violations.  Cooper testified that he called the hotline once at the end of 2005, while working in Hurricane, and again in November or December of 2006, while working in Sealy.  (*Id.*

---

[2]   Cooper's allegations about three "assaults" by Hansen, which Fuller investigated thoroughly, were dismissed on summary judgment as a basis for relief. (Docket Entry No. 40 at 40-41).  At trial, Wal-Mart introduced evidence of Cooper's complaints about these incidents to show that many of his statements were bizarre and incredible.  Cooper gave his version of the incidents in response, repeating before the jury his belief that he had been poisoned by a sharp object secreted in a ring Hansen wore and that the motivation was race discrimination.

at 100:20-101:8).  Dana Fuller testified that when an employee in her region telephones the ethics hotline, a ticket number is generated and she is promptly notified by email.  Fuller testified that she is required to take prompt action once the complaint is forwarded to her and that "if for some reason there is no action taken, the people back in the ethics department are calling" and instructing her to address it.  (*Id.* at 112:11-13).  According to Fuller, she never received any notice that Cooper had made a complaint by calling the hot line during the time he worked in Sealy.  Fuller also testified that Cooper never complained to her about employees working at Sealy using racially offensive terms to Cooper or in his presence.  (*Id.* at 125:18-128:2).

After Cooper completed his case-in-chief, Wal-Mart moved for judgment as a matter of law under Federal Rule of Civil Procedure 50.  Wal-Mart renewed the Rule 50 motion after the close of evidence.  After the jury was charged and the parties presented closing argument, the jurors began deliberating just before 11:30 a.m. on January 20, 2010.  At 10:10 a.m. the following day, the foreperson sent a note to the court.  It read as follows: "We are hopelessly dead-locked and are firmly convinced that further deliberation will not result in a verdict."  (Docket Entry No. 70-3 at 1).  After conferring with the parties, this court responded: "Please continue to deliberate.  In doing so, please consider the court's instructions on the bottom of page 9.  Please also consider the instructions on page 10 about presenting any question you may have to the court."  (*Id.* at 2).  Approximately one hour later, the jury foreperson sent another note.  It stated: "Respectfully, we have considered the instructions in their entirety and in particular as contained at the bottom of page 9 and on page 10.  We are hopelessly deadlocked with no prospect of a resolution which would result in a verdict."  (Docket Entry No. 70-4).  The court conferred with the parties and declared a mistrial.

On February 18, 2010, Wal-Mart renewed its motion for judgment as a matter of law.  Wal-Mart argues that no reasonable jury could find in favor of Cooper on the hostile work environment claim because the testimony showed that many of the statements and events that Cooper testified to had no racial aspect; the harassment was not severe or frequent; and there is no evidence showing that Wal-Mart knew about race-based harassment and failed to respond.  (Docket Entry Nos. 71, 72).  Cooper has responded, arguing that the record provides sufficient evidence to warrant a retrial.  (Docket Entry No. 77).

## II.    The Applicable Law

A motion for judgment as a matter of law is appropriate when a party has been fully heard on an issue and reviewing the entire record shows no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue.  FED. R. CIV. P. 50(a).  *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003).  In evaluating the record, the court must make all reasonable inferences for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097 (2000).  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  *DP Solutions*, 353 F.3d at 427 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)).  "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  *Reeves*, 530 U.S. at 150, 120 S. Ct. 2097 (quoting *Anderson*, 477 U.S. at 250-51, 106 S. Ct. 2505).  A court may grant a motion for judgment as a matter of law "only when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict."  *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998); *see also Texas Farm Bureau v. United States*, 53 F.3d 120, 123 (5th Cir. 1995).  Wal-Mart made the necessary motions during the trial to support its renewed motion for judgment

10

as a matter of law.  *See* FED. R. CIV. P. 50(b); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007);  *Allied Bank-West v. Stein*, 996 F.2d 111, 114-15 (5th Cir. 1993).

The fact that a court denies summary judgment or that the jury was unable to agree does not preclude granting judgment as a matter of law based on the full trial record.  *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 n.1 (2d. Cir. 1999) (Sotomayor, J.); *DeMaine v. BankOne*, 904 F.2d 219, 221 (4th Cir. 1990); *Gross v. Southern Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir. 1971) ("It is settled in this Circuit, therefore, that prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict."); *Noonan v. Midland Capital Corp.*, 453 F.2d 459, 463 (2d Cir. 1972); *Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 431 F.Supp.2d 1319, 1322 n. 1 (S.D. Fla. 2006); *see also* 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER § 2537, at 627-28 (3d ed.) ("Notwithstanding the jury's failure to reach a verdict, if the standard for granting a motion for judgment as a matter of law is met, a renewed motion for judgment as a matter of law under Rule 50(b) is appropriate and may be granted.").  Although resolving disputes in the evidence that depend on credibility is for a jury, a court may render judgment as a matter of law when no reasonable jury could find the testimony credible.  *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S. Ct. 1504 (1985); *see also Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002); *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998).

## III.   Analysis

Cooper argues that Wal-Mart has violated his rights under § 21.051 of the Texas Labor Code by subjecting him to a hostile work environment.  Section 21.051 provides:

11

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> > (1) fails to or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
> >
> > (2) limits, segregates, or classifies and employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX. LAB. CODE § 21.051.  This section is meant to give effect to the mandates of Title VII of the 1964 Civil Rights Act.  TEX. LAB. CODE § 21.001(1); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).  In applying the Texas statute, courts should rely on "analogous federal statutes and the cases interpreting them [as a] guide."  *Quantum*, 47 S.W.3d at 476.  Like Title VII, the Texas statute makes actionable discrimination because of race (or another protected category) "in connection with compensation or the *terms, conditions, or privileges* of employment."  TEX. LAB. CODE § 21.051(1).  Using nearly identical language in Title VII,[3] the Supreme Court has held that a claim for a racially hostile work environment requires harassment that is so severe and prolonged that it affects a term, condition, or privilege of employment.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64-67, 106 S. Ct. 2399 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23, 114 S. Ct. 367 (1993).

The parties agreed at trial to submit this case as involving only coworker harassment and not to submit any instructions or questions about harassment by supervisors.  The posttrial motions and

---

[3]  42 U.S.C. § 200e-2(1) makes it an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" a protected characteristic.

briefs are similarly limited to the coworker harassment standard.  And, as explained below, none of the statements that a jury could find to be racially harassing were made by direct or successively higher supervisors.

The elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action.  *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir. 2002).  Cooper has the burden to prove all five elements.

The record supports Wal-Mart's argument that there was no evidence except Cooper's subjective belief that most of the statements and events he identified as harassing were based on his race.  *See, e.g., Baker v. FedEx Ground Package Sys. Inc.*, 278 F.App'x 322, 329 (5th Cir. 2008) (per curiam) (unpublished) ("The phrases 'fired girl walking' and 'stupid' are not 'based on race' and, thereby, do not sustain a race-based hostile work environment claim."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006) ("Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted."); *Vallecillo v. U.S. Dept. of Housing & Urban Devel.*, 155 F.App'x 764, 767-68 (5th Cir. 2005) (per curiam) (unpublished) (filtering out statements that were not based on race or national origin before determining whether the harassment was severe or pervasive).  For example, Cooper's testimony about Lasher saying "no guns" in the employee orientation, Lasher's statement right before Cooper left Hurricane that "Paul Peterson [who worked in Sealy] is my peezoe," are neither explicitly racial nor, according to the testimony and evidence, were stated in

a context that would have made them racist. A similar problem is present as to Cooper's testimony that Bruhnke said when watching a television report about a fire in the part of town where Cooper lived said that his apartment might be on fire and Cooper's testimony that Peterson said that "we are a family here." A reasonable jury could not find that these and similar alleged comments were based on Cooper's race. There is insufficient evidence for such a finding because Cooper repeatedly testified that his evidence of racial bias was that the speaker was white and he is black. *See McCray v. DPC Industries, Inc.*, 942 F.Supp. 288, 292 (E.D. Tex. 1996) ("a plaintiff must show something more than that he was treated badly and that he is black"). Cooper's testimony that he took Eric Lasher's "no guns" comment as based on a race-based stereotype does not provide sufficient evidence for a jury to find it was based on race. Cooper admitted that Lasher's statement was made during a new-employee orientation training about Wal-Mart policies and that Wal-Mart's policy that drivers could not carry firearms was prominently posted at the distribution center. Similarly, no reasonable jury could find that Don Wishon's comment about a "burnt co-driver" was race-based because it came just after Cooper had reported a fire in the truck that he and Wishon were assigned to drive. Nor is there sufficient evidence to support an inference that Rob Bruhnke's alleged comment about Cooper not being able to "hang in his neighborhood" was race-based. Cooper testified that he was "not sure what exactly he was referring to," that it could have been the neighborhood in suburban Chicago where Bruhnke grew up, or the neighborhood in Texas where Bruhnke lived at the time. (Jan. 19, 2010 Trial Tr. at 34:1-21). Cooper's subjective belief that the comments were tied to race is not enough. *See Daniels v. BASF Corp.*, 270 F.Supp.2d 847, 854 (S.D. Tex. 2003).

Nor is there any basis to support an inference that the events, as opposed to comments, Cooper testified about were based on race. There is no evidence of race as the basis for such alleged

14

events as someone tearing the corner off Cooper's paycheck stub, someone rubbing poison ivy on his uniform and baby wipes, the Regional Manager "assaulting" him by jostling his arm, which made him spill coffee, and by slapping him on the shoulder with a hypodermic needle secreted in a ring in order to poison him.

Cooper did testify that some comments were explicitly racist. They include the following:

- In November 2005, an unidentified employee said "monkeys dress like that" in the cafeteria in Hurricane;

- An unidentified "husband and wife team" of drivers said "here comes the nigger" in December 2005 outside  the driver's lounge in Hurricane;

- In a June 2006 phone call, a driver named John working out of Hurricane used the word "monkey" in a phone conversation with Cooper, who was by then in Sealy;[4]

- In October 2006, a white driver said the word "nigger" at Wal-Mart's Palestine, Texas facility.

A reasonable jury could also find that one other statement — "has anybody whipped you yet?" allegedly said to Cooper in January 2007 by Ruth Johnson — was racist in nature.  Wal-Mart argues that these comments are not sufficiently severe or pervasive to have altered the terms or conditions of Cooper's employment.

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also Watkins v. Texas Dept. of Criminal Justice*, 269

---

[4]  Cooper testified at trial that he and John were friends and that they were having a friendly conversation, during which John blurted out the word "monkey."  (Jan. 19, 2010 Trial Tr. at 38:14-41:1).

F.App'x. 457, 463-464 (5th Cir. 2008) (per curiam) (unpublished).  The Supreme Court has explained that courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance."  *Harris,* 510 U.S. at 23, 114 S. Ct. 367.  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)) (quotation marks omitted).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. 775, 788, 118 S. Ct. 2275 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 118 S. Ct. 998 (1998)).

Some courts have found it inappropriate to enter judgment as a matter of law for the employer on a hostile work environment claim when the plaintiff submits evidence of even one instance of the highly offensive racial terms Cooper stated that he heard.  *See, e.g.*, *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (internal citations omitted)); *Bailey v. Binyon*, 583 F.Supp. 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*."); *see also Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 289 n.2 (5th Cir. 2004) ("Indeed, a racial epithet does demonstrate racial animus."); *Brown v. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) ("unlike certain age-related comments

16

which we have found too vague to constitute evidence of discrimination, the term 'nigger' is a universally recognized opprobrium, stigmatizing African-Americans because of their race").  In other cases, as Wal-Mart points out, the Fifth Circuit has held that judgment as a matter of law was warranted despite evidence of such clearly offensive racial epithets.  *See., e.g. Johnson v. TCB Constr. Co, Inc.*, 334 F.App'x 666, 671 (5th Cir. 2009) (per curiam) (unpublished) ("[A]lthough Turner's alleged comment to Johnson that he was just 'like a damn nigger' in asking for a raise is repulsive, it is isolated and Johnson has offered no evidence concerning its objective effect on his work performance." (quotations omitted)); *Turner v. Baylor Richardson Medical Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (holding that a supervisor's comments about "ghetto children" was not sufficient to create a fact issue as to severe and pervasive harassment).  In this case, the sporadic and infrequent nature of these comments must be considered in combination with the evidence that Cooper did not report many of them to Wal-Mart; when he did, Wal-Mart responded promptly and reasonably; and that Wal-Mart consistently gave Cooper good performance reviews and regular raises and that he was able to perform his job duties without difficulty.

"When a company, once informed of allegations of [] harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability."  *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir. 1993).  "'Prompt remedial action' must be 'reasonably calculated' to end the harassment."  *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir. 1999) (quoting *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986)).  Although this requires a case-by-case determination, the Fifth Circuit has "often found that an employer took prompt remedial action as a matter of law."  *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 329 (5th Cir. 2004) (collecting cases).  "One factor [the Fifth Circuit has] found

dispositive is whether the plaintiff reasonably took advantage of corrective opportunities provided by the employer." *Id.*

In *Hockman*, 407 F.3d at 329-30, the Fifth Circuit affirmed summary judgment in favor of the employer, Westward, because, it agreed that, as a matter of law, the employee, Hockman, could not prove that Westward had failed to take prompt remedial action. The court cited four key facts supporting that conclusion:

> (1) Hockman received the Westward employee handbook containing the company's antiharassment policy; (2) the policy provides that if the employee does not feel that her allegation is being handled satisfactorily by his or her supervisor, then she should report the incident directly to the Director of Human Resources; (3) she acknowledged her receipt of the handbook and understanding of its provisions with her signature; and (4) despite her awareness, there is no evidence that Hockman availed herself of any of the company's provisions after speaking to French, several months after the alleged harassment began.

*Id.* This was sufficient to overcome Hockman's testimony that she had been told not to go over the head of her direct supervisor and that her supervisor had shown her an incorrect version of the harassment policy. *Id.*; *see also Harvill*, 433 F.3d at 437-39 (reaching the same conclusion for another employee suing Westward based on related incidents).

In the present case, it is undisputed that Cooper received Wal-Mart's associate handbook, including the antiharassment and antidiscrimination policy. He also completed periodic computer-based training sessions that communicated Wal-Mart's policies. Wal-Mart provided multiple avenues for reporting harassment, including to supervisors through the Open Door Policy, to Human Resources officials, to the Ethics Hotline, and to the Resources for Living Hotline. Cooper testified that he was familiar with all these options.

18

There is evidence in the record that Cooper complained to Michael DiGioa, an Operations Manager in Hurricane, after a warehouse employee said "monkeys dress like that" in November 2005. (Jan 15, 2010 Trial Tr. at 16:17-17:4). Cooper testified that in November or December 2005, he called Wal-Mart's Resources for Living Hotline, which directed him to the Ethics Hotline. Cooper stated that he complained about the issues he had faced in Hurricane. He testified that he made a similar complaint to Darwin Jones, a manager in Hurricane. Cooper testified that he did not know of actions taken in response to these complaints. (*Id.* at 18:8-19:24). But there is undisputed evidence that Wal-Mart did investigate Cooper's complaint about comments made to him in Hurricane. Wal-Mart addressed the issues that arose in Utah when it allowed Cooper to transfer out of the Hurricane Distribution Center. Wal-Mart granted this transfer after Cooper had worked in Hurricane for less than four months, even though company policy ordinarily required employees to work in a location for a full year before transferring. Fuller stated in an affidavit that the transfer was granted "in order to resolve 'issues' that had arisen between [Cooper] and other drivers, including [his] team driver with whom he jointly operated a commercial Wal-Mart truck." (Docket Entry No. 31, Ex. 5, ¶ 3). The transfer out of Utah was reasonably prompt; Cooper complained in November or December 2005 and was granted the transfer in January 2006. *See Harvill*, 433 F.3d at 437-39 (holding that the employer took prompt remedial action as a matter of law where the supervisor investigated after the complaint was made but the harassment continued for four more months before the plaintiffs' attorney complained to upper management, which ended the harassment completely); *cf. Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 807-08 (5th Cir. 1996) (concluding that failing to investigate or take any action during nearly six months of abuse was not prompt remedial action). Because transferring Cooper to Sealy was "reasonably calculated" to end the harassment, Wal-Mart cannot be held liable for the harassment in Hurricane.

19

There is no evidence in the record that Cooper complained to Wal-Mart about any of the race-based statements he alleges after he transferred to Sealy.  After a white driver allegedly said the word "nigger" at the Palestine Distribution Center in October 2006, Cooper did not make a report.  He testified as follows:

> Q:  And you didn't call Wal-Mart's 1-800 number and report the use of that "N" word, did you?
>
> A:  No.  I kept my mouth shut.
>
> Q:  You didn't take to the management of the Palestine Distribution Center, did you?
>
> A:  No.
>
> Q:  You didn't talk to management at your distribution center or transportation center, did you?
>
> A:  No.
>
> Q:  In fact, you didn't report this very serious incident to anyone at Wal-Mart, did you?
>
> A:  No.  I didn't want to lose my job, saying something like that to the wrong manager.

(Jan 19, 2010 Trial Tr. at 35:3-15).  Similarly, Cooper did not complain to Wal-Mart after Ruth Johnson allegedly asked him in January 2007 if he had been "whipped."  He testified that he "kept quiet about it."  (*Id.* at 37:15-17).  There is no evidence that Cooper made a complaint when the Hurricane driver named John allegedly used the word "monkey" over the phone in June 2006.

Cooper testified at trial that he made a general complaint by telephoning the Wal-Mart Ethics Hotline in November or December 2006.  This date was before Johnson allegedly asked if Cooper had been whipped but after the other two alleged instances of racially offensive statements.  Dana Fuller testified, however, that she is notified as a matter of course by e-mail whenever an employee

calls the Ethics Hotline. She stated that she never received notice that Cooper had called and that no record exists of the call. Fuller also testified that each ethics complaint is assigned a ticket number so it can be tracked. Fuller stated that she is required to take prompt action once the complaint is forwarded to her, and that "if for some reason there is no action taken, the people back in the ethics department are calling" and instructing her to address it. (*Id.* at 112:11-13). With these measures in place for recording and addressing ethics complaints, Fuller testified, "[i]t's impossible for it to get lost." (*Id.* at 112:14).

Fuller and Paul Peterson also testified that when Cooper made other complaints that could be investigated, including the complaints about the "assaults" by Mike Hansen, they did so. (*See, e.g., id.* at 121:4-125:17). The record shows that two weeks after the alleged incident occurred, Cooper reported to Wal-Mart that after a meeting about defensive driving, Hansen approached and hit him on the shoulder or back. After the contact, Cooper felt a stinging sensation. Cooper testified that his shoulder developed a bruise and eventually formed a scab and that he went to a V.A. hospital, where a doctor apparently prescribed a course of antibiotics or a tetanus shot. Cooper believed his illness was caused by Hansen injecting poison using a concealed needle. After going to the V.A. hospital, Cooper reported the alleged assault to Wal-Mart, which sent him to a doctor. At the doctor's office, Cooper told the nurse practitioner that the lesion on his shoulder was from a bug bite. (Docket Entry No. 31, Ex.5, ¶ 30). Given Cooper's statements about the physical and mental symptoms he was experiencing, and his prior accusations that some unknown person had torn a corner off his paycheck stub, rubbed his uniform and baby wipes with poison ivy, and then that Hansen had poisoned him with a concealed needle, Wal-Mart became concerned that Cooper could not function safely as a truck driver. (*Id.*, ¶¶ 9, 17, 22, 26).

21

Although credibility determinations ordinarily should be left for the jury, a court may disregard testimony and render judgment as a matter of law when no reasonable jury could find the testimony credible. *See City of Bessemer*, 470 U.S. at 575, 105 S. Ct. 1504. "[F]actors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id.* Even when an appellate court reviews a factual finding pertaining to credibility under a clear-error standard, it may vacate if it finds that such factors are present. *Id.* A factual assertion or denial "may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no need to submit the issue" to a jury. *Chavin*, 150 F.3d at 728 (citations omitted). Applying these rules in the summary judgment opinion, this court held that no reasonable jury could credit Cooper's claim that he had been assaulted by Mike Hansen. Presented with the totality of Cooper's claims in this case, including the bizarre allegations surrounding the Hansen incidents on which Wal-Mart elicited testimony at trial,[5] a reasonable juror could not credit Cooper's testimony that he had complained to the Wal-Mart Ethics Hotline about coworkers' use of the terms "nigger" and "monkey" and yet no investigation or other action was taken. In light of

---

[5] Cooper's allegations that Wal-Mart was harassing him because of his race continued after his employment at Wal-Mart ended. Cooper testified in his deposition that during his 2008 orientation with his subsequent employer, Crete Carrier Corp., an "elderly gentleman" assaulted him at a restaurant for which Crete had given Cooper and the other drivers a $10 gift card. Cooper testified that he was walking out of the restaurant with a sandwich in one hand and a beverage in the other as this elderly gentleman and his wife were walking in. The man started laughing and engaging in a "nonchalant conversation" with Cooper, in which he referred to Cooper's meal and asked, "[w]ell, is that for me?" At the same time, according to Cooper, the man "grabbed" Cooper on his shoulder and with his other hand "smack[ed]" Cooper on the back of his tricep. "[D]ays later, a welt showed up" in the same location. Cooper photographed the welt with his camera phone. (Docket Entry No. 31, Ex. 1, Cooper Depo. at 34-37). In his deposition, Cooper speculated that there was some association between this restaurant incident and the alleged assault by Hansen. Cooper alleges that, because Wal-Mart has some business dealings with Crete and Crete knew Cooper would be at the restaurant, the event was "an outright racist-terrorist assault on me, against me" by Wal-Mart and Crete. (*Id.* at 38-41). Cooper also believed that he was being followed in his truck and spied on by individuals sent by Wal-Mart security and the Klu Klux Klan because "it would benefit Wal-Mart to just have [him] incarcerated." (*Id.* at 48-50).

Fuller's explanation of the ethics complaint process and Wal-Mart's prompt investigation into Cooper's other complaints, the testimony that he complained about racial harassment is "so utterly implausible" that no reasonable juror could credit it or insufficient to support a reasonable finding of racial harassment.

Cooper also argues that Wal-Mart admitted knowing about the harassment.  He stated that Kay Murphy, the Human Resources Manager in Sealy told him in May 2006 "they should not try to run people off they should let them leave on their own."  (Docket Entry No. 35, Ex. 3, Cooper Decl., ¶ 3).  Leaving aside the vague nature of Murphy's statement, it does not raise an issue about Wal-Mart's knowledge of the three instances of alleged race-based comments in Sealy because it predated all three, which took place in June and October 2006 and January 2007.

Cooper also stated that Dana Fuller said to him "Wal-Mart is liable, do you know what this says about management?"  (*Id.*).  Fuller denied making this statement at trial.  But even if she did, it does not evidence her knowledge of the race-based harassment Cooper alleges.  Cooper testified during pretrial evidentiary hearings that his conversation with Fuller occurred after Wal-Mart had suspended him with pay out of concern for his mental fitness to drive Wal-Mart's trucks.  Cooper stated that, before Fuller made the statement, he "was complaining to her about racial discrimination and not having the ability or the opportunity, or the opportunity to drive for Wal-Mart; and [he] mentioned the assault with Mike Hansen."  (Tr. of Jan. 15, 2010 Evidentiary Hearing at 37:14-18).  On cross-examination, Cooper was asked about what he said to Fuller.  He stated: "That I was assaulted by Mike Hansen, and I was being discriminated against and not given the opportunity to drive for Wal-Mart.  And I mentioned about all the drug screens I took.  And I think that's probably about it."  (*Id.* at 38:13-18).  When asked a clarifying question, Cooper testified vaguely that he complained about "racial discrimination, the harassment and retaliation" but could not remember

23

anything specific.  (*Id.* at 38:19-39:11).  Cooper's counsel followed up.  The testimony proceeded as follows:

> Q:      What specifically did you tell her about the discrimination and harassment?
>
> . . .
>
> A:      In particular I told her about the assault by Mike Hansen; my uniforms broke out in a rash; those baby wipes were contaminated; the drug screens, that they were taking too many drug screens.
>
> . . .
>
> Q:      Did you tell her anything else?
>
> A:      Not that I can recall at this moment.

(*Id.* at 41:16-42:16).  When a further evidentiary hearing was held on this same statement, Cooper testified that he "was talking to Mrs. Fuller explaining to her about the racial discrimination and stuff, the harassment and then the assault.  And she came out and said, you know, 'Wal-Mart is liable, and do you know what this says about management?'"  (Jan 19, 2010 Trial Tr. at 10:1-5). This is not a sufficient basis for a reasonable jury to infer that Wal-Mart admitted knowing about the specific instances of racial harassment, as Cooper argues.  The statement is vague and the context provided by Cooper's own testimony does not show that Fuller was responding after being told about any of the three instances of race-based harassment that Cooper alleges he faced in Sealy.

Cooper has not presented evidence from which a reasonable jury could find that Wal-Mart knew that he was subjected to race-based harassment and failed to respond.  Cooper's hostile work environment claim fails as a matter of law.

**IV.      Conclusion**

Wal-Mart's renewed motion for judgment as a matter of law is granted.[6]  Final judgment is entered by separate order.

SIGNED on June 18, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[6]  On June 16, 2010, Cooper sent an email to the court asking for counsel to be appointed. "Title VII provides for the appointment of an attorney for a Title VII complainant upon request 'in such circumstances as the court may deem just.'"  *Gonzalez v. Carlin*, 907 F.2d 573,  580 (5th Cir. 1990) (quoting 42 U.S.C. § 2000e-5(f)(1)).  The plaintiff does not have the automatic right to appointment of counsel.  *Id.*  (citing *Caston v. Sears, Roebuck & Co.*, 556 F.2d 1305, 1309 (5th Cir. 1977)).  To appoint counsel under Title VII, this court must examine three factors: (1) the merits of the plaintiff's claims of discrimination; (2) the efforts taken by the plaintiff to obtain counsel; and (3) the plaintiff's financial ability to retain counsel.  *Gonzalez*, 907 F.2d at 580; *Caston*, 556 F.2d at 1309 (5th Cir. 1977); *see also Salmon v. Corpus Christi Independent School District*, 911 F.2d 1165 (5th Cir. 1990).  It is unclear whether the Texas Labor Code, under which Cooper has advanced his claims, provides the same right to counsel.  Even under the Title VII standard, Cooper does not appear to be entitled to counsel.  He was previously represented and, in effect, fired his attorneys.  In any event, because Cooper's claims fail as a matter of law, the motion to appoint counsel is moot.

25